Edward M. GOLDBERG, M.D., Plaintiff-Appellee, Cross-Appellant,

v.

MEDTRONIC, INC.,
Defendant-Appellant,
Cross-Appellee.

Nos. 81–1172, 81–1173.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 20, 1982.

Decided Aug. 16, 1982.

Rehearing Denied Oct. 28, 1982.

John F. Lynch, Arnold White & Durkee, Houston, Tex., for defendant-appellant, cross-appellee.

Roy E. Hofer, Chicago, Ill., for plaintiff-appellee, cross-appellant.

Before PELL, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and GORDON, District Judge.[*]

FAIRCHILD, Senior Circuit Judge.

The plaintiff's complaint alleged a misappropriation of proprietary information through the breach of an implied obligation of confidence[1] and patent infringement. Judgment, separately entered, dismissing the infringement claim,[2] was affirmed on an earlier appeal. *Goldberg v. Medtronic, Inc.*, 654 F.2d 727 (7th Cir. 1981). Defendant Medtronic appeals from a judgment finding it liable for misappropriation of confidential information. Plaintiff Goldberg cross-appeals insofar as the judgment limited the relief granted.

### I. Background and Facts

The facts of this case, essentially as set forth by the district court, are as follows.

This litigation involves one aspect of artificial cardiac pacing, a medical technique that

---

[*] District Judge Myron L. Gordon of the Eastern District of Wisconsin is sitting by designation.

[1] Jurisdiction over this claim was based on diversity of citizenship. 28 U.S.C. § 1332.

[2] The plaintiff alleged that Medtronic's product had infringed on five claims of his patent. The district court found that three of the claims had not been infringed by Medtronic and that the remaining two, though satisfying the novelty requirement of 35 U.S.C. § 102(a), were invalid under 35 U.S.C. § 103 (obviousness).

allows a person's heartbeat to be steadied, stimulated, or re-established. This artificial pacing of the heartbeat has been achieved by means of a pulse generator which transmits regular electrical impulses to the heart. The pulse generator is connected to the heart by, and relays the electrical impulses to the heart through, electrical leads. The leads are attached to the heart either on the outside of the organ, that is, through the epicardium to the myocardium, by means of a surgical procedure, or the inside of the organ by means of a transvenous procedure, in which case the lead is termed transvenous or endocardial.

The focus of this litigation is on exterior, or myocardial electrical leads, and recent developments in their design which facilitate their installation and improve their reliability and permanence. In the earlier stages of the development of these leads, it was found that they had a tendency to work themselves loose. Early leads consisted simply of insulated stainless steel wire looped through the myocardium. Later, a plastic platform to which two stainless steel spikes were attached, was added to the end of the wire. The plastic platform was sutured to the heart so that the spikes extended into the myocardium. Because the spikes were rigid, however, the pulsating motion of the heart caused the spikes either to break or to enlarge the hole in which they were situated. This problem was greatly alleviated by the development of a flexible coil spring lead in place of the rigid spikes formerly used. The method of insertion of the coil spring lead was not different from that formerly used, that is, the coil was inserted into an incision made by the surgeon in the wall of the heart.

The myocardial leads were implanted by means of a thoracotomy, a major surgical procedure involving the opening of the chest. The difficulty of this procedure, and its debilitating effects on the patient, made it unacceptable for the elderly or in emergency situations. Various other insertion techniques were devised, each with drawbacks. An emergency procedure was developed in which the lead was attached to the heart through a needle that was inserted into the chest wall. This procedure was not totally satisfactory in that the surgeon could not visually monitor the needle within the chest and because the continuous motion of the heart could cause the lead to work itself loose. Another method, known as transvenous insertion, involved feeding the lead down a vein near the base of the neck and into the heart while the surgeon observed by means of a fluoroscope. The drawback of this method was that the lead was not attached to the heart wall and was free to move in the chamber.

In the early sixties, Dr. Goldberg, an attending surgeon at Michael Reese and Cook County Hospitals in Chicago, developed the concept of a safe, sutureless, visually and remotely installable lead for heart pacemakers. Dr. Goldberg's idea involved approaching the heart inferiorly, as opposed to from the neck region, and using a mediastinoscope to screw a rigid, helically shaped lead tip into the ventricle with an insertion tool. Dr. Goldberg first contacted Medtronic, a Minnesota corporation involved in the development and sale of pacemaker leads, in the fall of 1964 in connection with his idea. Dr. Goldberg asked Charles Eddy, the local sales representative for Medtronic, if Medtronic would aid in research and experiments involving the new lead. Medtronic agreed to do so.

In the next year, Dr. Goldberg conducted experiments on dogs at Michael Reese Hospital. The only individuals apprised of these experiments were those working with Dr. Goldberg or associated with him. In the summer of 1965, Dr. Goldberg attended an American Medical Association research forum where he discussed mediastinoscopy and indicated that he was able to approach the heart through the inferior mediastinum and place an electrical lead on the ventricle. He did not, however, disclose the screw-in lead concept or the precise method of insertion and attachment.

The district court found that Dr. Goldberg was subsequently contacted by Inga Haug, a Medtronic representative, who had heard of his presentation at the AMA meet-

ing and his statement that he could attach a lead to the heart through a mediastinoscope through the inferior mediastinum. Haug invited Dr. Goldberg to Medtronic headquarters in Minneapolis to discuss his work. Medtronic paid Dr. Goldberg's expenses for this trip. In Minneapolis, Dr. Goldberg met briefly with Earl Bakken, President of Medtronic. Later, he explained and demonstrated his screw-in lead concept to Bakken and other Medtronic representatives. The court further found that Bakken denied that these meetings took place [3] but numerous other witnesses testified as to their existence. The district court concluded that Dr. Goldberg made this trip and discussed his concepts for insertion of pacemaker leads.

In December, 1965, Eddy first saw the screw-in lead Dr. Goldberg had developed. Eddy communicated his information to Bakken. Bakken stated certain objections to the method of insertion, mediastinoscopy, but not to the screw-in lead concept. Bakken had received these objections from Dr. William M. Chardack, who was advising Medtronic and who apparently was apprised of Dr. Goldberg's work.

In January, 1966, Goldberg made a presentation on the topic of mediastinoscopy at the Michael Reese Heart Institute. Eddy was present and immediately contacted Bakken as to what was discussed. Bakken continued to express his lack of interest in the procedure. However, after further discussion with Eddy on the topic of Dr. Goldberg's screw-in leads, Bakken instructed Eddy to invite Dr. Goldberg to Medtronic's headquarters in Minneapolis in March, 1966. Medtronic once again paid Dr. Goldberg's expenses for the trip, although Medtronic had no record of any such meetings. Eddy, however, testified that he had made the arrangements for the trip and that his diary reflected that the meeting took place on March 16, 1966.

Dr. Goldberg again demonstrated his leads to Bakken who indicated that he would be interested in working with Dr. Goldberg on the project. Medtronic agreed to provide equipment for the research. Dr. Goldberg agreed not to publish the results of his work prematurely so as to protect, as Eddy testified, the proprietary interests of the parties. Eddy conceded that the leads would be improved through further research and that the research involved confidential proprietary information. Medtronic agreed to make for Dr. Goldberg his helically tipped screw-in lead. In the ensuing months, Medtronic sent Dr. Goldberg many leads and other equipment for use in his research. Medtronic, again, kept no records of its transactions with Dr. Goldberg.

In April, 1966, Bakken called Dr. Goldberg and stated that Medtronic's advisor, Dr. Chardack, did not see the need for a new lead and opposed the procedure of mediastinoscopy. For these reasons, Medtronic would not actively participate in the research. Medtronic continued, however, to supply equipment.

At Bakken's request, Eddy contacted Herb Taus at General Electric Company and told him that Dr. Goldberg had an innovative technique for implanting pacemaker leads and was looking for assistance on the project. Bakken instructed Eddy to keep Medtronic advised of the research and of any progress achieved. He was instructed to maintain a rapport and relate to Medtronic anything he saw or was told.

While at General Electric, Dr. Goldberg disclosed his idea of a screw-in lead to Henry Tachick. The research which followed was successful in the development of a viable lead. The patent application filed by General Electric in August of 1967, however, was on behalf of Tachick, not Dr. Goldberg. Several years later, the U. S. Patent and Trademark Office put Dr. Goldberg's patent application and Tachick's patent into an interference to determine the actual inventor. Goldberg prevailed in 1976 when General Electric filed a disclaimer under 35 U.S.C. § 253.

---

**3.** This aspect of the district court's findings appears to be incorrect. Bakken testified that he met with Dr. Goldberg, but denied recollec-tion of who else was present or of whether inferior mediastinoscopy was discussed. *See* Tr. 1316–1317.

Shortly after Dr. Goldberg's first visit to Medtronic in the fall of 1965, Medtronic hired Lee Bolduc to conduct research in and to manufacture leads. In April, 1966, just after Bakken told Dr. Goldberg he was not interested in actively assisting him in his research, Bolduc, working directly for Medtronic, made a special lead for Dr. Goldberg and was going to send it to him. Later, Eddy asked Bakken about the status of the electrode. Bakken stated that he had changed his mind and would not provide this electrode to Dr. Goldberg even though it incorporated Dr. Goldberg's designs. Eddy and Bolduc then met with Dr. Goldberg in June, 1966, at an AMA conference and discussed Dr. Goldberg's research. Some time prior to August, 1968, Bolduc showed Bakken a screw-in lead designed to be installed with a mediastinoscope.

In January, 1967, Dr. Goldberg met with Medtronic officials in Minneapolis. The progress of his research at General Electric was discussed. Again, Medtronic had no record of this meeting. Eddy's diary established the exact date of the meeting as January 7, 1967. In 1967, Eddy continued to monitor Dr. Goldberg's research. In May, 1967, Eddy and Manny Villafona from the Minneapolis office of Medtronic came to Chicago and observed Dr. Goldberg install his lead in a dog. Dr. Goldberg apprised them of the present and anticipated developments in the apparatus. Eddy immediately informed Bakken of what Dr. Goldberg had shown them. On June 7, 1967, Eddy received a phone call from Jack Schwartz, Medtronic's national sales manager. Schwartz wanted Eddy to obtain technical data about Dr. Goldberg's lead for Wilson Greatbatch, a member of Medtronic's Board of Directors and its Design Review Board.

By means of a letter to four major pacemaker companies, dated October 28, 1968, General Electric offered to license its lead derived from Dr. Goldberg's work, under its August, 1967, Tachick patent application. Medtronic was one of the companies to receive the letter, and Medtronic's president, Earl Bakken discussed the letter with Taus and Bolduc but not with Eddy. Medtronic contends that the Tachick application and the General Electric letter made Dr. Goldberg's ideas public and thus removed Medtronic's obligation of confidence.

In 1969, Bolduc's work on screw-in leads resulted in a test model of Medtronic's Model 6917 lead. This lead embodied Dr. Goldberg's concepts of a rigid, helical tip screwed into the heart with a special tool. The coil was, however, mounted on a plastic platform similar to that used by Chardack in other lead designs. Bakken instructed Bolduc to proceed with testing the lead without first seeking the approval of the Design Review Board so as to avoid Chardack's objection. There was testimony that Bolduc admitted that the idea behind the Model 6917 lead was derived from Dr. Goldberg.

In 1970 and 1972 Dr. Goldberg was issued West German and British patents, respectively, for his lead. Although Medtronic now claims that Dr. Goldberg's disclosures in obtaining these patents relieved Medtronic of any obligation of confidentiality, Medtronic did not know of these patents until 1974, after it had put its own device on sale. Dr. Goldberg obtained a United States Patent for his device on January 4, 1977.

In October, 1972, Medtronic began marketing its Model 6917 lead for use in humans. Dr. Goldberg became aware of the Model 6917 lead when, in 1973, Medtronic's representative in Chicago demonstrated it at Michael Reese Hospital. Dr. Goldberg informed him that the Model 6917 embodied ideas and designs that were rightfully his. Medtronic refused to discuss the matter.

Dr. Goldberg initiated this suit on January 23, 1976, seeking legal and equitable relief for Medtronic's alleged misappropriation of his concept of a safe, sutureless, visually and remotely installable lead for attaching a cardiac pacemaker to the heart. On October 26, 1977, the district court ordered that the issues of liability and damages be tried together. Trial proceeded before a jury for four weeks in December of 1978. At the jury instruction conference held at the close of evidence, the court indicated that there was insufficient evi-

dence of damages to allow Dr. Goldberg to proceed with his legal remedy. Dr. Goldberg then elected to abandon his claim for legal relief, dismiss the jury, and proceed solely on his equitable claim before the court.

On July 7, 1980, the district court issued its Findings of Fact and Conclusions of Law. The court dismissed Dr. Goldberg's patent claim, but found that there had been a confidential relationship between Dr. Goldberg and Medtronic and that Medtronic had misappropriated confidential information disclosed in that relationship by Dr. Goldberg. The court further found that none of the information misappropriated by Medtronic was obtained from public sources. On the question of the appropriate relief, the court decided that Dr. Goldberg was entitled to ten percent of the net profits from the sale of Medtronic's Model 6917 lead until the issuance of Dr. Goldberg's United States Patent relieved Medtronic of its duty to Dr. Goldberg in 1977. The court found that Medtronic's gross income from the Model 6917 lead for that period was $12,842,000 and that the costs incurred in its production amounted to $4,086,000. The court noted that any other elements of cost were not in evidence. The award of ten percent of the net profits was based on the court's determination that figure represented Dr. Goldberg's contribution to the development of the Model 6917 lead.[4] Despite these determinations, the court reserved a precise calculation of damages until after the issue had been briefed.

On January 5, 1981, the district court, after further briefing, entered its final decision. The court denied Dr. Goldberg's prayer for punitive damages. It awarded Dr. Goldberg $875,600, with interest at the statutory rate from July 7, 1980, the date of its order fixing liability. Noting Dr. Goldberg's claim that he should be awarded all of Medtronic's profit, the court explained:

> "As an alternative to this position and with reluctant acceptance of the court's earlier views, Dr. Goldberg has moved for entry of judgment in the amount of $875,000, which is ten percent of Medtronic's gross profits, calculated by deducting the production costs from total sales, as set out in the findings of the court.

> "The ten percent figure arrived at and announced by the court as the suggested basis for a damage formula is an equitable determination based on a variety of factors. It must first be recognized that, in the furnishing of equipment and leads, Medtronic made significant contributions to Dr. Goldberg's research virtually from the beginning. Further, Dr. Goldberg's contribution, the basic idea with a minimum of research and testing, was developed, tested, marketed and promoted at significant expense by Medtronic. The evidence makes it clear that the only feasible method of promotion and sale available to Dr. Goldberg was through a licensing agreement with some company able to develop, manufacture and market the idea. A reasonable royalty fee was indicated by the evidence to be ten percent. All of these factors impelled the court to what it believed to be the equitable conclusion that ten percent of the gross profits of Medtronic would be a figure calculated to make Dr. Goldberg whole.

> "It is within the equitable powers of the court to utilize as the formula for the ascertainment of the moneys due the successful plaintiff the concept of reasonable royalties. The evidence supports, and the court has already concluded, that a reasonable royalty in this case is ten percent of the gross profits established by the evidence introduced by the plaintiff as to gross sales and gross costs of manufacture.

> "No elaborate accounting hearing is required to ascertain what items of expenses on the part of Medtronic are deductible from the gross income figure to constitute profit. The utilization of a royalty theory makes this unnecessary. Royalties may be a percentage of whatev-

---

4. The court noted that the value of Dr. Goldberg's contribution was not "precisely ascertainable" and that he could not be "credited with the development, promotion and marketing of the product."

er figure the parties agree to or the court elects. Royalties might have been determined at ten percent of the gross sales figures, as plaintiff contends, but were not. It is the equitable determination of the court that an appropriate award to the plaintiff is arrived at by taking a reasonable figure of ten percent (derived, among other things, from evidence concerning royalties) and applying it to the figure of $8,756,000, a figure arrived at by subtracting production costs from gross income based on evidence introduced by plaintiff."

In connection with the allowance of interest beginning July 7, 1980, it should be noted that the $875,600 awarded equals the amount which would have resulted from the figures included in the July decision. Medtronic appealed from the court's judgment and Dr. Goldberg cross-appealed the court's limitation of his damages.

## II. The Breach of Confidence Claim

On this appeal, Medtronic has conceded that Dr. Goldberg made some disclosures concerning his lead concept to Medtronic officials and that these disclosures imposed an implied obligation of confidence upon Medtronic. Furthermore, Medtronic admits that its Model 6917 lead incorporated some aspects of Dr. Goldberg's concept. Therefore, the only remaining issue is whether certain public disclosures of Dr. Goldberg's lead concept—General Electric's offer to license the lead and its patent application on behalf of Tachick in 1968 and Dr. Goldberg's 1970 West German patent and 1972 British patent—destroyed the obligation of confidence incumbent upon Medtronic so

that Medtronic's sales in and after 1972 created no liability. The district court found that Medtronic could not avoid its obligation of confidence due to the availability of lawful means of obtaining the concept when those means were not employed. We affirm.

 Since jurisdiction over Dr. Goldberg's breach of confidence claim was based on diversity of citizenship, this court is bound to apply the law of the forum state under the *Erie* doctrine. Thus, the law of Illinois, including its choice of law rules, *Kalmich v. Bruno*, 553 F.2d 549, 552 (7th Cir. 1977), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300, initially governs this claim. In an action of this type, Illinois would apply substantively "the law of the place where the alleged wrong was committed or the benefit was obtained." *Crown Industries, Inc. v. Kawneer Co.*, 335 F.Supp. 749, 760–761 (N.D.Ill.1971). The parties agree that this rule would lead to application of the law of Minnesota, where Medtronic maintains its manufacturing and research facilities and where any breach or benefit would have occurred.

 Dr. Goldberg's breach of confidence claim is governed in part by the principles set forth in *Cherne Industrial, Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81, 205 U.S.P.Q. 854 (Minn.1979).[5] *Cherne Industrial* involved the analogous claim of a breach of confidence in the employment context: Cherne Industrial was one of the leaders in the preparation of the operations and maintenance ("O&M") manuals required by the federal government for

**5.** This case went unnoticed by all parties in the court below and it was assumed that the Minnesota courts had not addressed this issue. Illinois choice of law rules require reference back to Illinois law in the absence of Minnesota law, *Shannon v. Wolf*, 173 Ill. 253, 50 N.E. 682 (1898), and the district court proceeded on that basis. Though the *Cherne Industrial* case is raised for the first time on this appeal, we find no reason to refrain from applying it, especially since it is doubtful that the result would be different under Illinois law. *See ILG Industries, Inc. v. Scott*, 49 Ill.2d 88, 273 N.E.2d 393 (1971); *Schulenburg v. Signatrol, Inc.*, 33 Ill.2d 379, 212 N.E.2d 865 (1965), *cert. denied*, 383 U.S. 959, 86 S.Ct. 1225, 16 L.Ed.2d 302 (1966). Medtronic has relied on these cases for the proposition that Illinois courts will fashion relief based upon whether a defendant *could have* obtained the confidential information in a lawful manner. This is a correct reading of the cases as far as *relief* is concerned, but Medtronic erred in attempting to transfer this rule to the determination of *liability* at issue here. In both cases the Illinois courts found defendants *liable* for a breach of confidence in spite of the possibility of lawful access to the information, but limited injunctive *relief* based on the availability of those lawful routes. Medtronic's argument in this area is erroneous.

newly constructed sewage treatment plants. Cherne entered the field early and developed some expertise in the preparation of the O&M manuals and compiled a sophisticated customer list.

In 1972 Cherne hired the defendant Grounds, who had little experience in the preparation of O&M manuals, as a full-time engineer and Grounds eventually became a vice-president in charge of the O&M manuals division. In 1974 Grounds left Cherne and began his own O&M manual business. Two other former Cherne employees soon joined Grounds' firm. All three defendants took a substantial amount of information, including customer lists and documents marked "confidential," when they left Cherne. The defendants used this information, their Cherne contacts, an Environmental Protection Agency (EPA) list of planned sewage projects, and other sources to compile a list of prospective customers.

Grounds and the other defendants used their list to solicit O&M manual sales, and succeeded in obtaining manual contracts worth nearly a half million dollars through 1977. Many of these contracts were with customers or prospective customers of Cherne about which the defendants learned while employed by Cherne. Cherne brought suit to enjoin the defendants from using the confidential information. Cherne asserted, in effect, that the defendants gained the information through a confidential relationship [6] that obligated them not to use it to Cherne's detriment.

The defendants responded that the information was not protected because it was all available from the EPA lists before Grounds & Associates obtained their first O&M manual contract. Indeed, the Minnesota court seemed to agree, finding that one of the elements of protected information is that it "is not generally known or readily ascertainable." *Cherne Industrial, id.* 278 N.W.2d at 90, 205 U.S.P.Q. at 859. Medtronic argues that the case be interpreted narrowly, in that the court found that the EPA lists did not in fact make information regarding prospective customers generally available.[7] However, it is clear that the Minnesota court properly emphasized the conduct of the defendants and not the nature of the information. "[E]ven assuming the presence of an alternate means of obtaining the names of consulting engineers, this, without more, is not sufficient to establish that the information is generally ascertainable." *Id.* at 90, 205 U.S.P.Q. at 860. The something more required by the court to make information generally ascertainable, and thus not within its definition of protected information, is actual reliance by the defendants on the publicly available information to the exclusion of the misappropriated information. As stated by the court: "[E]ven if the consulting engineers' names were otherwise available, the defendants' reliance on information gained from their relationship with plaintiff would still make them liable." *Id.* at 91, 205 U.S.P.Q. at 861.

To emphasize its position, the *Cherne Industrial* court quoted from *Elcor Chemical Corp. v. Agri-Sul, Inc.,* 494 S.W.2d 204, 213, 178 U.S.P.Q. 552 (Tex.Civ.App.1973):

It does not matter that [defendants, who developed in their garage a process for

---

**6.** The confidential relationship in *Cherne Industrial* was based on an employment agreement obligating the defendant employees not to use or disclose any of Cherne's confidential information, or take it with them upon leaving Cherne. The duties arising from the implied obligation of confidence are not less than the express obligation of confidence binding upon the defendants in *Cherne Industrial.* Medtronic has attempted to distinguish *Cherne Industrial* and other employment contract cases on the ground that plaintiffs there could have sued upon defendants' first use of the confidential information. However, it is not clear that Dr. Goldberg had no cause of action against Med-

tronic prior to their marketing of the Model 6917 lead. Had Dr. Goldberg been aware of Medtronic's actions, he may have been able to maintain an action to enjoin Medtronic's use of his ideas in their bad faith parallel research.

**7.** The court found that the defendants received the EPA lists barely half a year before obtaining their first O&M manual contract and that the EPA lists only revealed potential projects, not the names of the consulting engineers who would buy the manuals. To learn the name of the engineer, the city clerk for each of the 10,000 cities planning sewage projects would have to be contacted.

manufacturing fertilizer and did not disclose it to their employer in violation of their employment contracts,] could have gained their knowledge from a study of books and magazines. The fact is that they did not do so. Instead, they gained this knowledge from Elcor by way of their confidential relationship and in so doing they incurred a duty not to use it to Elcor's detriment.

*Cherne Industrial*, 278 N.W.2d at 91, 205 U.S.P.Q. at 860.

The *Cherne Industrial* court was applying well accepted legal doctrine. This court stressed the true nature of a case such as that at bar in *Servo Corporation of America v. General Electric Co.*, 393 F.2d 551, 555 (7th Cir. 1968): "The gravamen in a trade secrets case is a breach of confidence, rather than an infringement of a property right; hence, reliance on innocent sources of information involving no breach of duty, is an essential element of the defense that the secrets were previously disclosed." [8] The court noted that the existence of public disclosures is relevant only so far as the defendant actually relied upon them, and that the burden of proving such innocent reliance is on the defendant. *Id.* In addition to Illinois,[9] Minnesota, and Texas, sev-

eral other jurisdictions have held that one who breaches an obligation of confidence and uses confidential information to the owner's detriment is liable despite the fact that the information could have been lawfully obtained.[10]

The application of these principles to the case at bar is clear. Medtronic has admitted for purposes of this appeal that Dr. Goldberg disclosed his lead concept to Medtronic under circumstances creating an obligation of confidence and that Medtronic's Model 6917 lead incorporates "at least some aspects" of Dr. Goldberg's concept. The district court found that Medtronic misappropriated Dr. Goldberg's confidential information and used it to design the Model 6917 lead, thus breaching the obligation of confidence. Medtronic has asserted that public disclosures of the information at issue have negated its breach of confidence. However, Medtronic has not asserted an "essential element" of this defense; that is, Medtronic has not alleged that it relied on the public information as opposed to that gained through the breach of its obligation to Dr. Goldberg. In fact, the district court found just the opposite when it concluded that "[n]one of the concepts which Medtron-

---

**8.** The court cited *Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir. 1953) ("The essence of [plaintiffs'] action is not infringement, but breach of faith. [Defendants'] gained their knowledge] from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment."); *Standard Brands, Inc. v. Zumpe*, 264 F.Supp. 254 (E.D.La.1967); Nims, *Unfair Competition and Trade Marks* § 142 (4th ed. 1947).

**9.** *See* note 5 *supra*.

**10.** *See, e.g., Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 197 U.S.P.Q. 273 (5th Cir. 1978) (applying Louisiana law); *Grepke v. General Electric Co.*, 280 F.2d 508, 512 (7th Cir. 1960) (applying Indiana law: "[W]e consider irrelevant the alleged fact that in 1954, or even before then, from sources other than plaintiff, a similar method had been adopted in the industry. Certainly defendant does not contend that [its employee] resorted to general knowledge in the industry in reaching the result which he claimed to have achieved in 1953."); *Vitro Corporation of America v. Hall Chemical Co.*, 254 F.2d 787, 793 (6th Cir. 1958); *A. O. Smith Corp. v. Petro-*

*leum Iron Works Co.*, 73 F.2d 531, 538 (6th Cir. 1934) ("The mere fact that the means by which a discovery is made are obvious ... cannot ... advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer."); *Shellmar Products Co. v. Allen-Qualley Co.*, 36 F.2d 623, 625 (7th Cir. 1929) ("Whether it would have been possible to have discovered and purchased the Olsen patent, without the information disclosed to appellant in confidence, it is not necessary to determine, because it is clear from the record that by a breach of confidence the information was disclosed and used as a basis for the search that was made."); *Kamin v. Kuhnau*, 232 Or. 139, 374 P.2d 912, 135 U.S.P.Q. 133 (1962); *Julius Hyman & Co. v. Velsicol Corp.*, 123 Colo. 563, 233 P.2d 977, *cert. denied*, 342 U.S. 870, 72 S.Ct. 113, 96 L.Ed. 654 (1951); and *Tabor v. Hoffman*, 118 N.Y. 30, 23 N.E. 12, 13 (1889) ("[B]ecause this discovery may be possible by fair means, it would not justify a discovery by unfair means.").

ic misappropriated were obtained from public information."

Specifically, Medtronic failed to show it used the public information in General Electric's offer to license the lead or the Tachick patent application issued through General Electric. Indeed, it is difficult to conceive of such a showing; General Electric's information resulted from disclosures by Dr. Goldberg and therefore duplicated Medtronic's own knowledge. Medtronic knew or should have known the source of General Electric's information because Medtronic referred Dr. Goldberg to General Electric. Medtronic had no use for the General Electric information because it had been experimenting with the same concept for four or five years; therefore, Medtronic could not pretend to have relied on the General Electric information. With respect to Dr. Goldberg's 1970 and 1972 foreign patents, it is stipulated that Medtronic did not discover them until 1974. Therefore, it is clear that Medtronic could not have relied on those public disclosures in producing its 1972 Model 6917 lead.

Medtronic would have the court view this case as if its first acts which could be considered a breach of confidence were its sales in 1972. By that time, it argues, Dr. Goldberg must be deemed to have released Medtronic from any obligation of confidence. He had, in 1970 and 1972, obtained West German and British patents respectively. Because this represented a choice by Dr. Goldberg to rely on patent protection rather than secrecy, Medtronic says it no longer had an obligation of confidence when sales began in 1972; these sales could not be a predicate for liability even though it had no knowledge that its obligation had terminated.

Medtronic argues that *Cherne Industrial* supports its position. It is true that the Minnesota court in *Cherne Industrial* remarked that the confiding person's intention to keep information confidential is an element of protected information. Yet the court also said the fundamental question is whether the confidant used the public information or the information it received in confidence.

We need not decide, however, whether Medtronic's argument would be valid if Medtronic had remained loyal to the confidence until Dr. Goldberg chose the patent route, and thereafter, though without knowledge of the patents, Medtronic had developed and sold the leads. The facts are significantly different.

Medtronic's misappropriation began years before the patent disclosures even though the scheme in large part only came to fruition afterward. Thus, Medtronic's sales began in 1972 when the lead concept was no longer secret, but the work which made the sales possible began when the concept was still confidential.

An "obligation of confidence" in this context means more than an obligation to keep information secret; the obligation is akin to that of a fiduciary relationship. Dr. Goldberg reposed his trust in Medtronic upon disclosing his concepts to it and Medtronic accepted that trust. Thus, Medtronic had a duty to act in good faith when dealing with Dr. Goldberg. Medtronic, however, did act to Dr. Goldberg's detriment by conducting secret, parallel research, monitoring his progress while feigning a lack of interest, preparing to market and finally marketing a product based on his concepts while refusing to acknowledge his contribution. The fact that in the course of Medtronic's conduct, public disclosures revealed Dr. Goldberg's original concept does not negate Medtronic's bad faith both before and after the disclosures.[11]

### III. The Relief Awarded

The district court awarded Dr. Goldberg $875,600 with interest "at the statutory rate" from the date of its order fixing liability. The court arrived at this figure by determining that Dr. Goldberg was entitled to ten percent of Medtronic's gross income from the Model 6917 lead, less its

---

**11.** *See E. I. du Pont de Nemours Powder Co. v. Masland*, 244 U.S. 100, 102, 37 S.Ct. 575, 576, 61 L.Ed. 1016 (1917).

production costs, up to the date of Dr. Goldberg's United States patent. The court denied Dr. Goldberg's request for punitive damages.

Medtronic challenges the base figure used by the court to represent its profits and the court's award of interest prior to an exact determination of the award. Dr. Goldberg also challenges the court's measure of relief, contending he should have been awarded Medtronic's total profit during the appropriate period, and the court's denial of punitive damages.

### A. The Measure of Relief

█ The district court, acting in equity, has the discretionary power to fashion a remedy to do complete justice, including a monetary award if necessary. *Walters v. Marathon Oil Co.*, 642 F.2d 1098, 1100 (7th Cir. 1981). An appellate court will set aside such an exercise of discretion only if it is arbitrary. *Sears, Roebuck & Co. v. American Mutual Liability Insurance Co.*, 372 F.2d 435, 438 (7th Cir. 1967).

█ The district court, based on the evidence before it, found that Dr. Goldberg's contribution to the development of the Model 6917 lead was ten percent. The court recognized that a contribution figure is not readily ascertainable, but considered Dr. Goldberg's provision of the original concept and Medtronic's development, promotion and marketing of the lead. The court's determination in this respect is not clearly erroneous and therefore should not be overturned on appeal.

In this case, the court found an appropriate base figure to be Medtronic's gross income from sales of the Model 6917 lead, less its production costs, up to the issuance of Dr. Goldberg's United States patent. This

formula resulted in an award to Dr. Goldberg in the amount of $875,600, which the district court found to be an apt expression of the equities to be done in the case. In the final January decision the court referred to the base figure as "gross profits." In its previous July decision the court had indicated the ten percent would be applied to "net profits" and contemplated a showing of further costs which would result in a smaller base figure. In January, however, after further briefing and consideration, the court decided that it was equitable to award ten percent of "gross profits." He relied in part on the concept that he was awarding a royalty based on gross profits, noting in passing that the royalty might properly have been determined on gross sales.[12]

Considering the competing claims of the parties, the district court's decision is well within the range of reasoned discretion. Clearly Dr. Goldberg provided the idea for Medtronic's lead, and it may be that Medtronic would not have marketed such a lead but for Dr. Goldberg's disclosures. However, it is also true that Dr. Goldberg would not have been able to develop or market the lead himself, and would have eventually licensed the idea to a company such as Medtronic. An award of that amount of Medtronic's profits representing Dr. Goldberg's contribution is not arbitrary in this situation and thus should stand.

### B. Punitive Damages

█ The district court summarily denied Dr. Goldberg's request for punitive damages. Though some of Medtronic's conduct may have justified an award of punitive damages under Minnesota's standard of an

---

**12.** Defendant has argued that the same exhibit which showed the gross profit figure of $8,756,-000 indicated overhead and other similar costs from which net profit for the same period could be computed at $1,478,000. Plaintiff responded that the cost allocations were not adequately substantiated. Defendant asserts, in the alternative, that the parties must be given an opportunity to submit additional evidence to determine net profit. Yet in the district court, defendant made only a vague suggestion that the court set forth ground rules "if the Court feels any further evidence is necessary."

One answer to defendant's argument is that it assumes the court intended to award ten percent of net profits. It is true the court so stated in the July order, but the court clearly decided to allow ten percent of gross profits in the final January order. The court pointed out that allowing a royalty of ten percent of gross profits "eliminates the need for an accounting-type investigation into appropriate offsets against gross profits to arrive at net figures, the formula remains an apt expression of the court's view of the equities to be done in this case, and judgment may be based upon it."

intentional harmful act, *Cherne Industrial,* 278 N.W.2d at 95, 205 U.S.P.Q. at 864, the district court did not abuse its considerable discretion in this area by denying such an award. The district court judge is in a much better position to gauge the blameworthiness of Medtronic and its officers and thus determine the necessity for punitive damages.

## C. Interest

In the final January decision the district court ordered that interest should run from July 7, 1980, the date of the July decision determining liability issues and at least approximating the money recovery. The July decision had withheld judgment until determination of the precise amount of damages. As already stated, the district court appears to have thought in July that the recovery would be somewhat less than finally determined.

Thus as of July 7 the amount was not liquidated or readily ascertainable. Under the usual rules, applicable in the forum state, Illinois, Dr. Goldberg could not have insisted upon allowance of interest as a legal right.

This was, however, an award of equitable relief. As it turned out the court used the same figures in making the award as had been set forth in his earlier decision. The court expressly directed that the interim interest be allowed. In an Illinois equitable matter, "the allowance of interest lies within the sound discretion of the trial judge and is allowed where warranted by equitable considerations and is disallowed if such an award would not comport with justice and equity." *Finley v. Finley,* 81 Ill.2d 317, 332, 43 Ill.Dec. 12, 19, 410 N.E.2d 12, 19 (1980). Presumably the court felt that the July decision had contained all the figures ultimately used and had suggested at least the method of determination, and that it was fair to have interest accrue as if the award had been made at that date. We find no abuse of discretion.

The judgment appealed from is Af-firmed. Each party shall bear his own costs of appeal.