GEORGE W. SHANNON *et al.*

*v.*

A. WOLF *et al.*

173   253
114a  ¹176

173   253
115a  ³151

*Opinion filed April 21, 1898—Rehearing denied June 9, 1898.*

1. MORTGAGES—*mortgagee neglecting to take possession after maturity loses lien.* A mortgagee in a chattel mortgage who neglects to take possession of the property within a reasonable time after the maturity of the mortgage debt loses his lien as against third persons, and as against such third persons the mortgage is void.

2. EVIDENCE — *courts do not take judicial notice of foreign laws.* Courts do not take judicial notice of the laws of a foreign country or State, but the same must be proved as any other fact.

3. CONFLICT OF LAWS—*courts do not presume that foreign law differs from law of forum.* A party to a contract made or to be executed in a foreign State, who desires to claim the advantage of some law or statute of such foreign State, must show, by appropriate pleadings and proof, what that law is, or the courts of the State where suit is brought will apply the law of the forum.

4. EVIDENCE—*over-due mortgage made in foreign State not admissible.* An over-due mortgage made in a foreign State is not admissible in a suit in this State to determine the ownership of a fund derived from the sale of the mortgaged property by the mortgagor after the maturity of the mortgage, which fund was attached by the creditors of the mortgagor, in the absence of any proof that under the laws of the foreign State the mortgagee's lien was not lost by failure to take possession after maturity.

5. ASSIGNMENTS—*what not an equitable assignment of fund.* A verbal direction by a shipper to the consignee to credit the proceeds of the sale of the goods to a party to whom such shipper was indebted, is not an equitable assignment of the fund as against an attachment served upon the consignee, as garnishee, before the sale, and before the direction had been acted upon in any way so as to change the position of the parties.

*Shannon* v. *Wolf,* 68 Ill. App. 486, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JOHN BARTON PAYNE, Judge, presiding.

This is a suit in attachment, begun by the appellants, composing the firm of Shannon Bros. & Co., against one

Edwin Strevell, a resident of Iowa, on August 5, 1889. The affidavit for attachment was made by Elmer J. Chamberlin, as agent of Shannon Bros. & Co. The indebtedness of Strevell was upon a note, dated June 15, 1888. The attachment writ was delivered to the sheriff at 10:30 o'clock on the morning of August 5, 1889, and thereafter, during the forenoon of that day, was served upon Jesse Sherwood, who, together with Robert Strahorn, constituted the firm of Strahorn & Co., as garnishee. Default and judgment were thereafter rendered in favor of the plaintiffs, Shannon Bros. & Co., against the defendant, Strevell. Interrogatories to the garnishees, Strahorn & Co., were filed, and were answered by such garnishees. The appellees, composing the firm of A. Wolf & Son, filed an intervening petition, claiming that the funds, garnished in the hands of the garnishees, belonged to them, and not to the attachment debtor, Strevell. The plaintiffs in the attachment suit, Shannon Bros. & Co., answered the intervening petition, denying the allegations thereof. The intervening petitioners filed a replication. An issue was thus formed, as to whether the funds in the hands of the garnishees were owned by Strevell at the time of the service of the attachment writ, or by the appellees, the intervening petitioners.

Upon the issue thus formed, a trial was had before the court without a jury, a jury being waived by agreement. The court found the issues in favor of the intervening petitioners, the appellees here, and ordered that $503.50, which the garnishees had previously paid into court on March 2, 1893, under an order of court then entered, should be paid over by the clerk of the court to the appellees; and that the appellants should pay the costs of suit. From this judgment an appeal was taken to the Appellate Court where the judgment was affirmed. The present appeal is prosecuted from such judgment of affirmance. The Appellate Court has granted a certificate of importance.

The facts, necessary to an understanding of the questions involved, are substantially as follows: Edwin Strevell was a farmer, residing in Albion, Iowa. He became indebted to the intervening petitioners, A. Wolf & Son, in 1888, in the sum of $8000.00, and on May 12, 1888, executed a note for that amount, payable October 12, 1888, to the order of A. Wolf & Son at the Exchange Bank of Parkersburg, Iowa. To secure this note, Strevell executed a chattel mortgage upon certain cattle in Iowa. On August 4, 1889, Strevell took a portion of these cattle from his farm, where they had remained ever since the execution of the chattel mortgage, to the railroad station, and shipped three car-loads thereof to Chicago. Two car-loads of the cattle were shipped in Strevell's name and one car-load in the name of one Bailey, who had married a niece of Strevell. Two of the way-bills showed Strevell to be the consignor of two car-loads of the cattle, and Bailey to be the consignor of the other car-load. The cattle were shipped to Strahorn & Co., at the Chicago Union Stock Yards, and Strahorn & Co. were named in the three way-bills, as consignees of the cattle. Strevell and Bailey accompanied the cattle, which arrived in Chicago on the morning of August 5, 1889.

The cattle were in the yards at Chicago as early as six o'clock in the morning, and were received by the employes of Strahorn & Co. at about that time. Between seven and eight o'clock of that morning, or about eight o'clock, Strevell saw Sherwood of Strahorn & Co., and stated to Sherwood that he was the owner of the cattle. During the forenoon of that day, or very soon thereafter, and after the service of the attachment writ on Strevell and the garnishees, Sherwood sold the cattle to outside parties, as the property of Strevell.

About eight o'clock Chamberlin, agent of Shannon Bros. & Co., met Strevell. Theretofore, Chamberlin had met Strevell in Iowa, about July 24, 1889, with a view of collecting the debt then due from Strevell to Shannon

Bros. & Co.    At that time, Strevell stated to Chamberlin that he was going to ship some cattle to Chicago, and that he would ship them to Shannon Bros. & Co.    On July 24, 1889, he wrote Shannon Bros. & Co. a letter from Iowa, stating that he would ship the cattle the first of the following week.    When Chamberlin saw Strevell early on the morning of August 5, 1889, he had previously learned, by looking at the bulletin board in the stock yards where the arrival of cattle was noted every morning, together with the numbers of the cars in which they arrived and the names of the consignees, that the cattle had been shipped to Strahorn & Co. instead of Shannon Bros. & Co. He stated this fact to Strevell and asked an explanation, but was put off by Strevell with the statement that he, Strevell, would see Chamberlin after awhile.    Thereafter, at about nine o'clock of that morning, Strevell went to the office of Strahorn & Co., and there told one Prescott, the book-keeper, that the cattle belonged to A. Wolf & Son, of Iowa, and that the proceeds of their sale were to be credited to A. Wolf & Son.    He and Bailey also signed a written order, directing the proceeds to be paid to Wolf & Son.    It is also stated, that Strevell then gave to the book-keeper a written order from Wolf & Son, stating where the proceeds of the cattle were to be deposited, but this order was not produced upon the hearing.

In explanation of the fact, that the shipments were made in the names of Strevell and Bailey, and not in the name of A. Wolf & Son claiming to be the owners thereof, Strevell says that, when he took the cattle to New Hartford and obtained cars for them, he told the agent there, that the cattle belonged to A. Wolf & Son, and were to be shipped in their name, but that the agent refused to issue shippers' passes to any one, except the actual shippers. Strevell says, that he had to ship the cattle in the names of himself and Bailey, in order to accompany the cattle upon the shippers' passes, and that, as it was nearly train time, it was found impossible to communicate with

A. Wolf & Son. There is some testimony tending to contradict the statement, "that, if a party wished to accompany cattle to a place, it would be necessary to ship in his name."

PECK, MILLER & STARR, for appellants.

HOYNE, FOLLANSBEE & O'CONNOR, for appellees.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

It is contended by the appellees in this case, that they were the owners of the cattle, which were shipped to the garnishees and sold by them. On the contrary, it is claimed by the appellants, that the cattle were owned by Edwin Strevell, and that they were entitled to hold them as attaching creditors of Strevell, through the service of the attachment writ upon the garnishees. The appellees, upon the trial below, introduced in evidence the note and chattel mortgage, executed by Strevell to themselves in Iowa. The introduction of this note and mortgage was objected to by the appellants upon the grounds hereinafter stated, which objections were overruled, and exceptions were duly taken to the order of the court so overruling them. Certain propositions of law also were asked by the appellants, stating the effect of the mortgage, and of the conduct of the parties thereunder, upon the rights both of the intervening petitioners and of the attaching creditors. These propositions of law were refused by the court, and marked refused, and exceptions were taken to such refusal.

*First*—It is insisted by the appellees, that the chattel mortgage was merely introduced for the purpose of showing that the appellees were creditors in good faith of Strevell, and that there was a valid indebtedness existing as a consideration for the transfer of the cattle to the appellees. In other words, the chattel mortgage is

alleged to have been introduced only for the purpose of showing the good faith of the claim of ownership of the cattle by the appellees. When the note and chattel mortgage were introduced in evidence, no limitation was made or announced as to the purpose of their introduction. It is impossible to conceive why they should have been introduced, unless it was for the purpose of showing title to the cattle in the appellees. When introduced for this purpose they were not competent, for the reasons urged when the objection was made to their introduction. These reasons are as follows: The note secured by the chattel mortgage was dated May 12, 1888, and was due October 12, 1888. The evidence is clear, however, that the cattle remained in possession of the mortgagor from October 12, 1888, the date of the maturity of the mortgage, up to August 4, 1889, when they were shipped to Chicago,—a period of nearly ten months. It is claimed by the appellants, that the failure of the mortgagees to take possession for several months after the mortgage lien had expired, and permitting the mortgagor to remain in possession for such a long time after the maturity of the mortgage, was a fraud upon the creditors of the mortgagor. It is, therefore, contended, that, when the cattle were shipped from Iowa in Strevell's name, and arrived in Chicago in the possession and under the control of Strevell, they were rightfully subjected to the claim of the attaching creditors in this case. We are unable to understand why this contention is not a sound and valid one. The law of Illinois has always been, that, if the mortgagee in a chattel mortgage neglects to reduce the property to possession upon the default of the mortgagor, or within a reasonable time thereafter to be determined by the circumstances of the parties, he loses his lien as against the rights of third persons, and that, as affecting the interests and liens of the latter, the mortgage becomes a void instrument. (*Burnham* v. *Muller*, 61 Ill. 453). In *Reed* v. *Eames*, 19 Ill. 594, where the parties

lived in the same town or county, it was held, that, if the mortgagee permitted the property to remain in the possession of the mortgagor one day after default, the delay would be unreasonable, and would constitute a fraud *per se* which could not be explained.

In *Cass* v. *Perkins*, 23 Ill. 382, it was held that, upon default in payment, the title vested absolutely in the mortgagee, and that a delay of three days after default was a fraud in law, and subjected the property to the lien of an execution theretofore levied.

It is claimed, however, by the appellees that the chattel mortgage here under consideration was executed in Iowa, and that, when the property was brought into this State, the rights of the mortgagees were not determined entirely by the laws of this State. The mortgage is claimed to be a contract made in another State and governed by the law of that State, and that it may be enforced in this State, inasmuch as it does not contravene our criminal laws or sanction vice or immorality. It may be, that this claim would have had much force, under the doctrine laid down in *Mumford* v. *Canty*, 50 Ill. 370, if there had been any proof of the laws of Iowa in regard to chattel mortgages. But no such proof was introduced. In *Mumford* v. *Canty*, *supra*, personal property was mortgaged in the State of Missouri, and permitted to remain in the possession of the mortgagor after the maturity of the debt, to secure which the mortgage was given. Upon being subsequently brought into this State it was seized under an attachment in favor of a *bona fide* creditor of the mortgagor; and it was there held, that the rights of the mortgagees as against such creditor would be determined by the law of Missouri; and that, as by the law of Missouri, the possession of the property of the mortgagor after maturity of the debt was not *per se* fraudulent as to the creditor, but might be shown to be *bona fide*, the rule would govern the rights of the mortgagee on his claiming the property, notwithstanding the fact that, under the

Illinois law, such possession in the mortgagor would be fraudulent *per se* as to creditors. That case, however, came up upon an agreed state of facts, wherein it was agreed, that both parties might refer to the statutes of Missouri on the hearing of the case. There was, then, proof in that case as to what the statutes of Missouri were. In the case at bar, however, there is no allegation anywhere in the pleadings as to the statutes of Iowa upon this subject, nor was any statute of Iowa introduced in evidence.

It is a well established doctrine, that no court will take judicial notice of the laws of a foreign country or State, but that the same must be averred and proved as facts. (Story on Conflict of Laws, sec. 637; 3 Am. & Eng. Ency. of Law, p. 539). If it had been made to appear by testimony in regard to the Iowa law, that, in that State, the possession of property by the mortgagor, after maturity of the debt, was not *per se* fraudulent as to creditors, a different case would here be presented; the case would be one for the application of the doctrine laid down in *Mumford* v. *Canty, supra.* But, as no proof was made of the Iowa law upon the subject, what follows? Where the party, interested in claiming the benefit of a foreign law or statute, fails to show, by appropriate pleading and proof, what is the law of the place where the contract was made or was to be performed, the courts of the State where the suit is brought will apply the law of the latter State to the contract. (3 Am. & Eng. Ency. of Law, p. 540). This court cannot indulge in the presumption, that the law of Iowa is different from the law of Illinois, in the absence of any proof upon the subject. We cannot presume, that an instrument, which is fraudulent and void by the laws of Illinois, is valid and enforceable by the laws of Iowa. (*Bonnell* v. *Holt*, 89 Ill. 71; *Hyman* v. *Bayne*, 83 id. 256).

In *Juilliard & Co.* v. *May*, 130 Ill. 87, we said (p. 97): "In the absence of any allegation or proof of a statute,

we must presume either that the common law obtains in New York, or else that the laws of that State are similar to the laws which prevail in this State, where the action was tried." In the case at bar, the propositions of law, submitted by the appellants to the trial court, and which were marked refused, announced substantially the Illinois doctrine, as to the effect of an unreasonable delay, on the part of the mortgagee in the chattel mortgage, in taking possession of the property after the maturity of the debt, as such doctrine is stated in the authorities hereinbefore referred to. It cannot be denied that, in this case, there was unreasonable delay, when the mortgagor was permitted to remain in possession of the property for more than nine months after the maturity of the debt. We are, therefore, of the opinion that the court below erred in admitting the chattel mortgage in evidence, and in refusing the propositions of law submitted by the appellants.

*Second*—It is said, however, that, at nine o'clock in the morning of August 5, 1889, Strevell went to the office of the garnishees, Strahorn & Co., and notified their book-keeper that the cattle belonged to the appellees, and that the proceeds of the sale thereof should be placed to the credit of appellees. The claim is, that this oral declaration to the book-keeper of the garnishees amounted to an equitable assignment of the proceeds of the sale to the appellees, A. Wolf & Son; and that, after the announcement thus made, the garnishees held the funds in their hands in trust for the appellees. If the conversation, which took place between the book-keeper of the garnishees and Strevell in the absence of the appellants, was competent testimony, the declaration of Strevell there made cannot have the effect sought to be given to it. It does not possess the elements, required by the authorities to constitute an equitable assignment of the funds in the hands of the consignee. At the time the declaration was made, the cattle had not yet been sold,

and the proceeds had not yet come into the hands of the
garnishees. The proof leaves it doubtful, whether or not
Sherwood received notice of the direction to hold the
proceeds to the credit of appellees, before the attach-
ment writ was served upon him. His evidence tends to
show, that the notice, which he received to hold the pro-
ceeds of the sale for the benefit of the appellees, came to
him at the same time at which the sheriff served the writ
upon him. In other words, the levy of the attachment
writ and the giving of the directions to the garnishees
were simultaneous.

When a draft is drawn against a consignment of goods,
and such draft contains a reference to an appropriation
of the proceeds of the sale of such goods, such reference,
together with other evidence of the appropriation, has
been held to create a lien. (1 Jones on Liens, sec. 59).
But a mere declaration by the shipper to the consignee
to apply the property to the payment of a bill does not
necessarily operate as an equitable assignment, unless
the bill itself was negotiated and discounted on the dis-
tinct understanding that the proceeds of the sale of the
property shipped should be applied to the payment of
the bill. It cannot be said, here, that the appellees dis-
counted and accepted Strevell's note with the distinct
understanding, that the proceeds of the sale of these
cattle should be applied to its payment. The rule, that
a banker, who has taken a note upon the consideration
that the proceeds of the shipment are to go to its pay-
ment, has a right to enforce that understanding against
the consignee, has no application to the facts of this
case. It is laid down in the text books, that, if a con-
signee receives goods under an express direction to apply
the proceeds to the payment of a bill of exchange, an
equitable lien is created in favor of the holder of such
bill, if he took it relying upon such appropriation, and
this will prevail over the general lien of the consignee.
(1 Jones on Liens, sec. 60). This rule, however, proceeds

upon the theory, that the party, claiming the benefit of such a direction, has parted with property on the faith of the understanding, and is seeking to enforce it against the consignee with whom the understanding was had.

Where a draft is drawn against a consignment and negotiated and sold to a bank, upon the representation that it was so drawn against the consignment and would be paid out of the proceeds, it was held that the claimant, purchasing the draft upon the faith of this direction, stood in a better position than a subsequent assignee for the benefit of creditors generally. (*Marine and Fire Insurance Bank of Georgia* v. *Jauncey*, 1 Barb. 486; *Hoyt* v. *Story*, 3 id. 262). So, where a consignor informed the consignee that he had drawn on him for $500.00 in favor of a third person, and the consignee promised the parties to the draft to honor it from the proceeds of the goods when sold, it was held, that there was a specific appropriation of that amount of the proceeds of the sale to the use of the payee, payable on the presentation of the consignor's draft. (*Lowery* v. *Steward*, 25 N. Y. 241). Here, if one of the appellees had gone to Strahorn & Co. with the direction from Strevell, and Strahorn & Co. had promised such appellee to pay over the proceeds of the cattle to appellees, and appellees had credited up a draft, or bought a note, or given Strevell credit in any manner, on the faith of Strahorn's promise to such appellee, then the cases referred to by counsel would be parallel with the case at bar. (1 Jones on Liens, sec. 61).

When specific directions are given as to a consignment of goods, and the consignee accepts them with the understanding that such directions are to be carried out, and the party, for whose benefit the directions are given, changes his position and parts with property, or assumes or incurs a liability, on the faith of such directions and understanding, then such directions and understanding will be binding on the consignee. (*Hall* v. *First Nat. Bank of Emporia*, 133 Ill. 234; *McCausland* v. *Wheeler Savings Bank*,

43 Ill. App. 381; *Brown, Shipley & Co.* v. *Kough,* L. R. 29 Ch. Div. 848; *Bailey* v. *Hudson River Railroad Co.* 49 N. Y. 70). The facts do not bring the case at bar within the rule thus announced.

The judgments of the Appellate Court and of the Superior Court of Cook county are reversed, and the cause is remanded to the Superior Court for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*