*In re* MARRIAGE OF PATRICIA VICTORIA OSBORN, Petitioner-Appellee, and JONATHAN VAUGHAN OSBORN, Respondent-Appellant.

Fifth District No. 5—88—0739

Opinion filed December 14, 1990.

Neubauer & Meyer, of Fairview Heights, for appellant.

David A. Campbell, of Campbell, Black, Carnine & Hedin, P.C., of Mt. Vernon, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

The parties were married in Quebec, Canada, on July 4, 1970. Five days prior to the marriage, Jonathan and Patricia entered into a written marriage contract in Montreal, Canada. The parties moved to Illinois in 1979 and were separated in 1985. Upon separation, Patricia returned to Canada with the parties' four children. On November 26, 1985, she filed a verified petition for dissolution of marriage in the circuit court of Clinton County. The court entered a judgment for dis-

solution of marriage on June 8, 1988. On July 27, 1988, the court entered its ruling on the issues of the validity of the marriage contract, the appropriate value of Jonathan Osborn's medical practice, child support, division of marital assets, award of attorney fees, medical and transportation expenses for the children, insurance benefits for the children, and visitation. Jonathan filed a post-trial motion addressing these issues. It is from the denial of said motion that Jonathan Osborn appeals.

■ We first turn our attention to the choice of laws question of whether to apply Canadian law in this case. Jonathan Osborn claims that this court should apply both Canadian and Illinois law in determining if the decision of the trial court was correct. Like Jonathan, Patricia makes general reference to Canadian common and statutory law. While we respect the parties' request to consider Canadian law, we are compelled to remind the parties that it has long been the rule that courts will not take judicial notice of the laws of another country, but they must be alleged and proved as facts. (*Shannon v. Wolf* (1898), 173 Ill. 253, 260, 50 N.E. 682, 684; *Crouch v. Hall* (1853), 15 Ill. 263, 266; see also *Dempster v. Stephen* (1895), 63 Ill. App. 126.) In the case at bar, scant reference is made to Canadian law. Included in the appendix to respondent's brief is a one-paragraph excerpt taken from the Canadian Family Law Reform Act (Que. Rev. Stat. ch. 41 (1978)). Other than references to a few Canadian cases in the parties' briefs and in a memorandum submitted to the trial court, no formal proof of the law of Canada has been submitted. When a party interested in claiming the benefit of a foreign law or statute fails to show by appropriate pleading and proof the status of the law of the place where the contract was made or was to be performed, the courts of the State where the suit is brought will apply the law of the latter State to the contract. (*Shannon*, 173 Ill. at 260.) Under the circumstances, we apply the law of Illinois, without consideration of Canadian law, to determine the issues in this case.

In his post-trial motion and on appeal, Jonathan Osborn argues that the court erred in finding the marriage contract to be unconscionable and in refusing to apply the contract in deciding issues of property division. Jonathan contends that Patricia made a judicial admission that the marriage contract settled and disposed of all issues involving property division, thereby resolving those issues.

It is undisputed that Patricia filed a verified petition for divorce on November 26, 1985. Attached to that petition was a copy of the parties' antenuptial agreement. Paragraph 6 of the petition alleges that "with respect to the issues of property division and payment of

outstanding debts *** the parties did on June 30, 1970, enter into a Marriage Contract, which settled and disposed of the issues of property division and debt payment, which would otherwise be issues before this court." In January of 1987, Patricia was granted leave of court to file an amended petition for dissolution of marriage. The amended petition did not include a copy of the marriage contract, nor did it refer to the contract. Patricia argues that although she initially took the position that the marriage contract was applicable to the property division, upon the filing of her amended complaint and throughout the case she has taken the position that the marriage contract is inapplicable to the property division.

██ When an original pleading is verified it remains a part of the record upon the filing of an amended pleading. Furthermore, the admissions of a party contained in an original verified pleading are judicial admissions and bind the pleader even after the filing of an amended pleading which supersedes the original. (*American National Bank & Trust Co. v. Erickson* (1983), 115 Ill. App. 3d 1026, 1029, 452 N.E.2d 3, 6; *Yarc v. American Hospital Supply Corp.* (1974), 17 Ill. App. 3d 667, 670, 307 N.E.2d 749, 752.) Notwithstanding these general rules, section 2—605 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—605) provides that verified allegations shall not constitute evidence, except by way of admission. However, this provision refers to admissions of fact, not admissions of law. (*Premier Electrical Construction Co. v. La Salle National Bank* (1984), 132 Ill. App. 3d 485, 494, 477 N.E.2d 1249, 1256.) Jonathan contends that paragraph 6 of Patricia Osborn's verified petition constitutes a judicial admission that the contract is valid and enforceable. Such a theory fails to recognize, however, that the allegations in paragraph 6 are legal conclusions, not factual conclusions. Questions of contractual validity or interpretation are matters of law for the court to decide. (*Northern Illinois Construction Co. v. Zale* (1985), 136 Ill. App. 3d 822, 824, 483 N.E.2d 1013, 1015.) Consequently, we find the argument that Patricia Osborn made a judicial admission that the marriage contract is valid is without merit. Based on our finding, we need not address petitioner's allegation that Jonathan Osborn waived on appeal his right to claim a judicial admission was made by the petitioner.

██ The next issue on the merits is whether the contract entered into by the parties is valid and enforceable. Antenuptial agreements are generally enforceable as long as the contract is entered into with full knowledge and without fraud, duress or coercion. (*In re Marriage of Byrne* (1989), 179 Ill. App. 3d 944, 947, 535 N.E.2d 14, 16; *Volid v. Volid* (1972), 6 Ill. App. 3d 386, 392, 286 N.E.2d 42, 47.) In the in-

stant case, Patricia does not allege that the contract was entered into because of fraud, duress or coercion. Rather, she contends that the contract is not valid because the parties did not intend for the contract to be used to divide the parties' property in the event of divorce. Her position is reflected in the trial court's ruling of July 27, 1988, where the court declared that it would not apply the parties' antenuptial agreement in deciding issues of property division. The court found that it was the intent of the parties "to take advantage of Quebec law in dealing with possible creditors and that it was not the intent of the parties to reach a reasoned agreement as to dealing with property in event of dissolution." The court concluded that "it would be unconscionable to apply the agreement herein under the intent and circumstances surrounding the entry of the agreement."

■ Patricia argues that the language of the contract itself does not conclusively establish that it is an antenuptial agreement. She contends that the document is clearly ambiguous as to its purpose and intent, and that the court properly allowed the admission of parol evidence to demonstrate the true purpose of the contract. To the contrary, we find that the contract is unambiguous and that it clearly delineates a property settlement in the event of divorce. To facilitate an understanding of our holding, the contract is set forth herein:

"MARRIAGE CONTRACT BEFORE Mtre. ERNEST AUGUSTE JAVET

the undersigned Notary for the Province of Quebec practising [sic] at the City of Montreal

APPEARED: *JONATHAN VAUGHN OSBORN*, residing in the City of Roxboro (Address: 55 11th Avenue) Junior Administrator;

*Hereinafter called* 'the future husband'
*OF THE ONE PART*:

AND:

*PATRICIA VICTORIA MALTBY*,
residing in the City of Pierrefonds (Address: 5620 Andre Street)
Technician;

*Hereinafter called* 'the future wife'
*OF THE OTHER PART*:

WHO, in view of the marriage which is shortly to be celebrated between them, have entered into the following Contract, namely:

*ARTICLE FIRST.* No community of property shall at any

time exist between the future consorts. On the contrary, they shall be separate as to property in conformity with Article 1422 and other provisions of the Civil Code of the Province of Quebec.

*ARTICLE SECOND.* Neither of the future consorts shall be responsible for the debts of the other whether contracted before or after the marriage.

*ARTICLE THIRD.* The property of the future wife shall include the following:

10. her wedding presents;

20. her wearing apparel, jewellery [*sic*] and other personal effects; and

30. all other property identifiable as now being hers.

The wearing apparel, jewellery [*sic*] and other personal effects which are in the possession of the future wife at the dissolution of the marriage shall take the place of those she now has without any claim on either side for any excess or deficiency.

*ARTICLE FOURTH.* The future husband obliges himself to pay all expenses of the household and of the marriage generally, and the future wife shall not be bound to contribute thereto; but she shall have no claim against the future husband for such of her revenues as she may contribute or as have been used for these purposes.

*ARTICLE FIFTH.* There shall be no dower, the future wife renouncing as well for herself as for the child or children who may be born of the marriage such dower or right of dower.

*ARTICLE SIXTH.* 1) In consideration of the stipulation that no community of property shall exist between the future consorts and of the renunciation of dower by the future wife, the future husband obliges himself to pay to the future wife, hereto present and accepting, during his lifetime the sum of ONE HUNDRED THOUSAND DOLLARS—but as an obligation on his part in favour [*sic*] of the future wife personally and exclusively.

The future husband shall have the right to pay the whole or any part of the said sum either in cash or by the transfer of moveable or immoveable property or to invest the same or any part thereof in the name and for the benefit of the future wife in real estate, loans secured by hypothec, [*sic*] and securities of any sort, nature and description.

If the said obligation shall not be satisfied during the lifetime

of the future husband and the future wife shall survive him, she shall have upon his death the right to exact immediate payment of the said sum of ONE HUNDRED THOUSAND DOLLARS—with interest from the date of his death at the rate of Six per centum per annum.

If the future wife shall die before the future husband, his obligation to pay the said sum of ONE HUNDRED THOUSAND DOLLARS—shall ipso facto be deemed never to have existed so far as such obligation may then be unsatisfied.

2) For the same consideration, the future husband obliges himself to pay to the future wife, hereto present and accepting, as soon and according as his means permit, the sum of TEN THOUSAND DOLLARS—for the purpose of acquiring household furniture and other moveables for the furnishing of their common residence.

The future husband shall be discharged from his obligation to pay the said sum to the extent of such payments on account as he may make and of the value of such household furniture and other moveables as he may acquire and place in the common residence for the furnishing thereof, but his heirs and legal representatives shall not be bound to pay any balance which at his death may remain unpaid of the said sum.

The future husband obliges himself to keep such household furniture and other moveables in repair and to replace with new what may become worn out or be destroyed.

*ARTICLE SEVENTH.* The future consorts hereby reciprocally give to the survivor of them all the property moveable and immoveable of which the succesion of the predeceased consort may be composed, unless the latter shall have disposed of the said property by Will or Donation *inter vivos.*

*WHEREOF ACTE:*

THUS DONE AND PASSED at the City of Montreal, this Thirtieth day of June Nineteen hundred and seventy, and of record in the office of the undersigned Notary under the Number Nine thousand eight hundred and forty eight.

And after due reading hereof, the parties signed in the presence of the said Notary.

(Signed) J. Osborn
 " P.V. Maltby
 " E.A. JAVET, Notary

A true copy of the original hereof remaining of record in my office."

Extrinsic evidence is inadmissible to vary, alter or contradict a written instrument which is complete, unambiguous, valid and unaffected by fraud, duress, mistake, or illegality. (*Johnson v. Flueckiger* (1980), 81 Ill. App. 3d 623, 624, 401 N.E.2d 1317, 1318.) The rule is that when the writing shows a complete legal obligation, without any uncertainty or ambiguity as to the object and extent of the engagement, it is conclusively presumed that the whole agreement of the parties was included in the writing. *Kendall v. Kendall* (1978), 71 Ill. 2d 374, 377, 375 N.E.2d 1280, 1282.

The instrument before us is entitled "Marriage Contract." It was executed just four days prior to the parties' marriage, and declares that its execution is made "in view of the marriage." The agreement specifies the title of property acquired both before and after the marriage. The rights and obligations of each spouse are delineated, with reference to the assets and liabilities which the parties were possessed both during and beyond the marriage. Patricia testified that she believed the purpose of the contract was to protect her family against creditors. The document is not ambiguous merely because it serves the purported purpose of guarding against creditors. Therefore, parol evidence consisting of testimony bearing on the intent of the parties in executing the contract was improperly admitted on the grounds that the contract was ambiguous.

Parol evidence was properly admitted, however, to show the real agreement of the parties where petitioner alleged that a mistake was made at the time the contract was executed. (See *Stoerger v. Ivesdale Co-op Grain Co.* (1973), 15 Ill. App. 3d 313, 317, 304 N.E.2d 300, 303.) Patricia argues that if the contract is to be construed as an antenuptial agreement, she and her husband were both mistaken as to its meaning, as they believed the purpose of the instrument was to protect their assets from creditors. A mutual mistake exists when the contract has been written in terms that violate the understanding of both parties. (*Beynon Building Corp. v. National Guardian Life Insurance Co.* (1983), 118 Ill. App. 3d 754, 760, 455 N.E.2d 246, 250.) We are unpersuaded that a mutual mistake as to the object and purpose of the contract was made. Jonathan has throughout this case taken the position that he was aware of the ramifications of the contract with regard to divorce, that the purpose of the contract was both to protect their assets from creditors and to determine the rights of the parties in the event of divorce.

As a general rule, relief will not be granted if but one party to a contract has made a mistake. (*People ex rel. Department of Public Works & Buildings v. South East National Bank* (1971), 131 Ill. App. 2d

.238, 240, 266 N.E.2d 778, 780.) Where a unilateral mistake is claimed, the conditions generally required for recission are that the mistake relate to a material feature of the contract, that it occurred notwithstanding the exercise of reasonable care, that it is of such grave consequence that enforcement of that contract would be unconscionable, and that the other party can be placed in statu quo. *Department of Public Works*, 131 Ill. App. 2d at 241, 266 N.E.2d at 780.

At trial, Patricia testified that prior to their marriage her husband asked her to have a marriage contract prepared to protect "our assets, mine and the children's, in case he was sued." She testified that divorce was never mentioned as a reason for the marriage contract, and that it was neither her nor Jonathan's intent to have the contract establish the property division in the event of divorce. Neither Patricia nor Jonathan was represented by an attorney at the time the contract was prepared and executed. The contract was prepared by a notary. Jonathan testified that in Quebec a notary is a person who specializes in preparing contracts.

Patricia testified that while she was given an opportunity to read the contract prior to signing it, she did not do so. She believed the purpose of the contract was to protect her and her family. Jonathan testified that he believed it was Patricia's family who recommended that they enter into a marriage contract. Jonathan testified that in discussing whether he and his wife should have a marriage contract prepared, Patricia's family advised them that "it was a way of protecting the family; that it was a way of insuring proper distribution of things in the case of a lawsuit." Jonathan explained that at the time of the original discussion, divorce was not mentioned, but later at the notary's office when he and Patricia executed the document, divorce was discussed. Jonathan recalled that prior to executing the agreement, the notary explained the division of property and the major clauses in the contract. Jonathan testified that the notary advised both him and Patricia that the document was not just to protect the family, but that it was "used for lawsuits for family disputes and for divorce." Jonathan also testified that if he and Patricia did not execute wills, the contract would suffice as their will.

Based on the parties' testimony it is apparent that Patricia believed the marriage contract was intended to protect the family. She has not alleged any fraud or coercion on behalf of her husband in enticing her to sign the agreement. On the contrary, it appears from the evidence that Patricia was provided with an explanation of how the contract would apply in the event of divorce, and was given the opportunity to read the document and ask questions as to its import, yet chose not to take ad-

vantage of her right to do so.

■■ The applicable standard of care necessary to rescind a contract on grounds of unilateral mistake is whether a person of reasonable prudence would have acted in the same manner under the same circumstances. (*Keller v. State Farm Insurance Co.* (1989), 180 Ill. App. 3d 539, 549, 536 N.E.2d 194, 200.) In light of the foregoing, we find the trial court's determination to be against the manifest weight of the evidence. Petitioner's mistaken belief that the contract was not applicable to divorce proceedings is not enough to declare that it would be unconscionable to apply the contract in this case. We, therefore, reverse the decision of the trial court and remand so that the trial court can apply the marriage contract in determining the issues of property division in accordance with section 503(d) of the Illinois Marriage and Dissolution of Marriage Act. Ill. Rev. Stat. 1989, ch. 40, par. 503(d).

Jonathan Osborn also argues on appeal that the trial court erred in dividing the marital assets and liabilities. Because this case is remanded in order for the court to take into account the antenuptial agreement, our examination of this issue would be premature.

■■ We next turn our attention to Jonathan Osborn's claim that the trial court erred in finding that he dissipated marital assets. Dissipation is defined as the use of marital property for one spouse's sole benefit or for a purpose unrelated to the marriage at a time when it is undergoing an irreconcilable breakdown. (*In re Marriage of O'Neill* (1990), 138 Ill. 2d 487, 492-93; *In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545, 549, 511 N.E.2d 676, 680.) We affirm the trial court's finding on this issue.

Jonathan testified that since the separation he has taken three trips with a woman. He testified that he took an 18-day business trip to Brazil and Argentina sponsored by the American Soybean Association. Jonathan Osborn testified that, although he is not a farmer and does not own any soybeans, he is involved in a group that does research in commodities in order to make money. Jonathan was accompanied by a woman on his excursion, and he testified that the trip cost him approximately $7,000.

In 1986, Jonathan accompanied the same woman to Aruba for one week. Jonathan testified that the woman's boss paid her fare and also paid the room and board. Jonathan estimated his personal expenditures for the trip to Aruba at $400 or $500. Jonathan also took a two-day trip with this same woman to Minnesota in 1986. He testified that he wanted to check on an investment that he had there. He estimated the total cost of the Minnesota trip, which he paid personally, at $400 or $500.

■■ With regard to dissipation, the trial court specifically provided:

"In regard to Petitioner's argument of dissipation of assets, the court finds there was a dissipation of assets on the trip [*sic*] to Brazil, Aruba, and Minnesota. If the United States government recognizes some business purposes in the trip to Brazil and Minnesota, so will the court. On the other hand, the court treats the dissipation as a matter of marital property to be divided.

| | |
|---|---|
| Brazil trip as marital property to be divided | $4,000 |
| Aruba trip | $ 700 |
| Minnesota trip | $1,000 |
| Marital property | $5,700" |

It is clear from the record that the trip to Aruba was a pleasure trip as Jonathan Osborn offered no evidence to refute this conclusion. Jonathan claims that the excursions to Brazil and Minnesota were business oriented; however, we do not find the trial court's decision to the contrary an abuse of discretion. (See *In re Marriage of Kaplan* (1986), 149 Ill. App. 3d 23, 32, 500 N.E.2d 612, 618.) Once it is established that one party has liquidated marital assets, the party charged with dissipation must establish by clear and specific evidence how the funds were spent; general and vague statements that they were spent on marital expenses or bills are inadequate to avoid a finding of dissipation. (*In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545, 550, 511 N.E.2d 676, 680.) Based on the record, we find no abuse of discretion in the finding of dissipation.

 Jonathan argues that there is no merit to the claim that his purchase of $5,000 worth of furniture constituted a dissipation of assets. We fail to see the import of this argument, as the trial court's ruling of July 27, 1988, upon which the court based its final judgment, expressly provides that the furniture in Jonathan's possession purchased since separation is marital property. The furniture is not included in the court's ruling with regard to dissipation. Because of our decision above to remand for further consideration of the marital contract in distributing the marital property, we will not address the issue of distribution of the furniture.

Jonathan next contends that the trial court abused its discretion in ordering him to pay Patricia's attorney fees in the amount of $13,500. Jonathan claims that Patricia is quite capable of paying her own attorney fees. At the trial, Patricia testified that when she and Jonathan married she worked as a lab technician at the Pulp & Paper Research Institute of Canada. She continued to work outside the home until their first child was born in July of 1974. From that time until the date of separation of the parties in 1985, Patricia Osborn was a homemaker and

did not work outside of the home except for occasional part-time employment. Patricia testified that she is currently unemployed, but is enrolled in a 3½-year nursing program, of which she has completed one year. She testified that she relies solely upon Jonathan's support payments and upon the financial assistance of her parents.

The income tax returns for Jonathan's medical corporation, of which he is the sole stockholder, show:

> "Gross profit 1984—$243,322
> Gross profit 1985—$244,846
> Gross profit 1986—$261,029."

Jonathan testified that his present income is $9,000 per month. As the sole stockholder of J.V. Osborn, M.D., Limited, he has the authority to take bonuses from the corporation. Jonathan testified that in December of 1986, he received a $14,000 bonus from the corporation. In February of 1987, he received a $30,000 bonus. Notwithstanding these figures, Jonathan points out that Patricia has received 72% of the marital assets in addition to $3,300-per-month child support. Jonathan maintains that this substantial award provides Patricia with sufficient means to pay her own attorney fees.

■■ ■ An award of attorney fees in a dissolution proceeding rests in the sound discretion of the trial court, and a court of review will reverse only for an abuse of discretion. The party seeking the attorney fees must show a financial inability to pay and must show the financial ability of the opposing spouse to pay. (*In re Marriage of Pitts* (1988), 169 Ill. App. 3d 200, 210, 523 N.E.2d 664, 670.) Financial inability does not mean destitution, but that the payment would strip the petitioner of her means of support and undermine her financial stability. (*Brandis v. Brandis* (1977), 51 Ill. App. 3d 467, 472, 367 N.E.2d 162, 166.) Evidence was presented that Patricia's attorney fees were in excess of $20,000. In view of Jonathan's ability to absorb the fee, and in view of the significant disparity in incomes between the parties, we do not find the trial court abused its discretion.

■■ Jonathan also contends that the evidence offered to prove the attorney fees incurred by Patricia was insufficient. The factors to consider in determining the amount of attorney fees are: the skill and standing of the attorney, the nature of the case, the novelty and difficulty of the questions in issue, the amount and importance of the subject matter, the degree of responsibility, the usual and customary charges, and the benefits resulting to the client. *In re Marriage of Armstrong* (1982), 107 Ill. App. 3d 217, 219, 437 N.E.2d 761, 762.

Patricia's attorney, David Campbell, testified that he has been practicing family law since 1969, and that he charges $90 per hour. He testi-

fied that this rate is consistent with the fees that are charged in the southern Illinois area. Campbell testified that lesser experienced attorneys charge $75 per hour, while more experienced attorneys charge upwards of $120 per hour for their services. He testified that he is a capable and highly qualified attorney. Campbell also testified that the divorce was difficult. In particular, Campbell had problems with respondent refusing to comply with discovery and refusing to pay child support. At trial, Campbell submitted as an exhibit a statement detailing the work he performed in this case. He calculated the total amount due for services rendered at $21,042. This amount included an estimation for the time he would spend at trial.

■■ Jonathan's counsel, Terry Neubauer, objected to the admission of the exhibit offered by Campbell. Neubauer argued that the account of services performed was a general statement which did not include an accounting of time spent on each task. Neubauer argued that the court could not determine what is fair and reasonable based on the exhibit offered by Campbell. An attorney's general statement as to time spent is an insufficient basis for a fee award. (*In re Marriage of Ransom* (1981), 102 Ill. App. 3d 38, 41, 429 N.E.2d 594, 598.) The court reserved admitting the exhibit until Campbell submitted a supplemental statement showing the time spent on each task performed. On August 3, 1987, six days following the trial, Campbell submitted an itemized account of the time spent on this case. The final accounting for fees due totaled $20,700. We conclude that there was sufficient evidence of the relevant factors used to consider the award of attorney fees and that the amount awarded is supported by the evidence.

■■ Attorney Neubauer also claims that he was denied the opportunity to cross-examine Campbell as to the supplemental statement because it was submitted after trial. We disagree. Although Neubauer claims he did not have the benefit of Campbell's itemized statement for use during trial, the record demonstrates that Neubauer did not even attempt at trial to question Campbell as to time spent on particular services. No objection was made to Campbell submitting the itemized accounting after trial. In addition, Neubauer did not request that he be permitted to recall the witness for cross-examination after Campbell's records were made available. Under these circumstances we find no error.

The trial court's award of child support is also challenged by Jonathan. Jonathan argues that Patricia failed to demonstrate that the children's need for child support exceeds $2,500 per month. Patricia submitted documentation as to the expenses incurred by her in maintaining her family, and testified that her and the children's monthly living expenses

totaled $4,472.35.

● 19 Our supreme court has held that to consider only the "shown needs" of a minor child is in effect to eliminate from the statute the consideration of the "standard of living the child would have enjoyed had the marriage not been dissolved." (*In re Marriage of Bussey* (1985), 108 Ill. 2d 286, 297, 483 N.E.2d 1229, 1234.) The evidence shows that for the 1986 and 1987 tax years Jonathan received a salary in excess of $100,000. In 1987, Jonathan's medical corporation held undistributed taxable income available for distribution to him in the amount of $55,443. In 1986, Jonathan made voluntary pension contributions in the amount of $65,512. It is clear that had the marriage not been dissolved, the children would have been afforded a higher standard of living. (See *In re Marriage of Tatham* (1988), 173 Ill. App. 3d 1072, 1094, 527 N.E.2d 1351, 1364.) Therefore, we find Jonathan's argument to be without merit.

▇▇▇ The trial court determined that respondent's average net monthly income was $9,793.44. Jonathan contests this figure to the extent that it is based upon the premise that Jonathan can claim five dependants on his tax return. Jonathan argues that the court failed to consider that Jonathan's exemptions will be phased out under the tax laws. Even assuming Jonathan will be precluded from claiming exemptions, no showing has been made that his net income would be significantly reduced. We note that Jonathan does not contest petitioner's argument on appeal that, in the event Jonathan is allowed only one exemption, the reduction in Jonathan's net monthly income would be only $252. Given these facts we do not find that the court abused its discretion.

▇▇▇ Jonathan also argues that the court should have taken into consideration that he will be required to pay all transportation costs associated with visitation. However, in the trial court's final judgment, the court did consider this factor:

> "Considering Defendant's income and also considering the expenses that he will have to incur in the cost of transporting the children and himself in connection with visitations [*sic*] *** the Court finds that Defendant's child support obligations to the Petitioner should be set at $3,300.00 per month ***."

In resolving the amount of child support payments, the court shall determine the minimum amount of support in accordance with the guidelines in section 505 of the Illinois Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1989, ch. 40, par. 505.) Using the figures given previously as to Jonathan's income, Jonathan's net monthly income is $9,793.44. Using the guidelines of section 505, Jonathan's minimum support obligation would be $3,917.38 per month. In the court's ruling of July 27,

1988, the court provided the following analysis to support its decision to award child support in the amount of $3,300 per month:

> "Total annual support $9,793.44 x 12 x 40% equals $47,008.51; $47,008.51 minus (transportation expense) 2,800 equals $44,208.51; $44,208.51 x $^{11}/_{12}$ (credit for the month he has them) equals $40,524.47; $40,524.47 x $^{1}/_{12}$ equals $3377.04 support per month. There is also appropriate expense of providing for continuance of support by provision for term life insurance on his life. Rounded off, the court orders Dr. Osborn to pay child support of $3300.00 for all four children per month."

It is clear that the trial court took into consideration the transportation costs Jonathan would incur and the cost of term life insurance Jonathan was ordered to acquire. The court also credited Jonathan with an amount equal to four weeks' support to compensate for the time Jonathan would exercise visitation. In view of the foregoing, we do not agree that the trial court's award of child support was contrary to the facts or the law, and therefore, we affirm the trial court's judgment ordering Jonathan to pay $3,300-per-month child support.

■■■ Jonathan next argues that the court erred in ordering him to pay child support on a monthly basis instead of on a weekly basis. No authority is cited in support of this proposition, and our research has not uncovered any authority which would require the court to order the payment of support at a weekly as opposed to a monthly schedule. No prejudice has been alleged by the respondent because of the monthly payment schedule. We find no abuse of discretion.

■■■ We further find no merit to Jonathan's claim that the trial court failed to consider that child support was awarded at United States currency rates as opposed to Canadian monetary standards. Jonathan argues that since United States currency is worth approximately 25% more than Canadian currency, Patricia received the equivalent of $4,000 per month Canadian currency in child support. Once again, no authority is cited which would require the court to consider this factor.

Patricia testified as to her expenses based on both United States and Canadian currency. Section 505 of the Illinois Marriage and Dissolution of Marriage Act does not provide an adjusted scale to compensate for differences in exchange rates. The court properly utilized section 505 in determining the percentage of Jonathan's income to be allocated to child support based on United States currency.

■■■ Next we are asked to determine whether the trial court erred in assessing the responsibility of transportation costs associated with visitation to Jonathan. As discussed above, the court took this cost into consideration in calculating the child support obligation. As Jonathan re-

ceived a substantial benefit in terms of a reduction in his support obligation for transportation expenses, we find the trial court did not abuse its discretion in its award.

■■ Finally, Jonathan contends that the trial court erred in ordering him to provide term life insurance on his life for the benefit of each minor child. The trial court's final judgment provides in pertinent part:

> "Defendant shall provide term insurance on his own life, naming the children as beneficiaries thereon, in the amount of $150,000 for each child. Defendant's obligation to carry said $150,000 term life insurance policy for each child shall terminate as to each child as he or she becomes emancipated or finishes college, whichever event last occurs."

A trial court is vested with the authority to order a parent to provide life insurance for the benefit of his children. (*In re Marriage of Dulyn* (1980), 89 Ill. App. 3d 304, 310, 411 N.E.2d 988, 993.) We find that the court did not act beyond its authority in ordering Jonathan to provide the life insurance.

Jonathan claims that there was no evidence presented as to the cost of term life insurance or as to whether Jonathan would be able to obtain such a policy. While specific evidence as to the cost of such policies was not presented, the trial court stated that it gave credit for the appropriate expense of the insurance in determining the child support obligation. Respondent has not shown that he has been unable to obtain term life insurance. In view of the circumstances of this case, we do not find that the court erred in ordering Jonathan to provide insurance to insure that the children would be provided for in the event of Jonathan's death.

In light of the foregoing, we reverse the trial court's decision with regard to the marriage contract and remand for further proceedings to determine the issues of property division. We affirm the trial court's decision as to all remaining issues addressed herein.

Affirmed in part; reversed in part and remanded.

HARRISON and WELCH, JJ., concur.