LEAR SIEGLER, INC.,
Plaintiff-Appellee,

v.

ARK–ELL SPRINGS, INC., et al.,
Defendants-Appellants.

No. 76–1167.

United States Court of Appeals,
Fifth Circuit.

March 9, 1978.

Michael Malski, Amory, Miss., David B. King, Aberdeen, Miss., Hugh P. Carter, Birmingham, Ala., for defendants-appellants.

Fred M. Bush, III, Tupelo, Miss., Ernie L. Brooks, Owen E. Perry, Paul J. Reising, Southfield, Mich., for plaintiff-appellee.

Before INGRAHAM, GEE and TJOFLAT, Circuit Judges.

INGRAHAM, Circuit Judge:

No-Sag Spring Division, a subsidiary of Lear Siegler, Inc., engages in the manufacture and sale of furniture springs and associated hardware. This case arose when a key employee of No-Sag, Robert F. O'Dell, Sr. founded a competing company, Ark-Ell Springs, Inc. No-Sag sued O'Dell and Ark-Ell for patent infringement, unfair competition and breach of employment contract.[1] The trial court directed a verdict in favor of No-Sag on the unfair competition and breach of contract counts, and rendered a verdict in No-Sag's favor on the patent count after submission of jury issues. We affirm the judgment on the contract and patent claims, but abstain from resolving the unfair competition claim at this time.

## THE UNFAIR COMPETITION AND BREACH OF CONTRACT COUNTS

Defendant O'Dell joined No-Sag in 1946. In 1963 he was made Plant Manager of No-Sag's Canton, Mississippi plant, a position in which he served until his resignation on May 15, 1971. As operating head of No-Sag's plant, O'Dell was exposed to the innermost workings of the sinuous spring industry.

Unknown to No-Sag, O'Dell began the formation of his own company, Ark-Ell, in September or October of 1970, eight months before he quit No-Sag. Ark-Ell was incorporated on November 20, 1970. From November 1970 until May 15, 1971, O'Dell served in the dual capacity of President of Ark-Ell and Plant Manager of No-Sag's Canton plant. During this period of time, he took over two hundred items from No-Sag, including prints, documents, die basis and machinery. The record indicates that

1. The district court had jurisdiction of the patent count under 28 U.S.C. § 1338 (1976). Because Lear Siegler is a Delaware corporation and Ark-Ell Springs is a Mississippi corporation, the district court had diversity jurisdiction of the trade secret count under 28 U.S.C. § 1332 (Supp.1977).

of these items, at least six were in fact used by Ark-Ell.[2]

O'Dell signed an employment contract when he began work for No-Sag. The contract bound him to secrecy concerning any information about the company's inventions, processes or methods. It further proscribed any other employment which might interfere with his duties, or be in competition with the interests of the corporation.

No-Sag sought damages from O'Dell for breach of this express contract, as well as for violation of his implied obligation of loyalty to his employer, and from Ark-Ell for inducing these breaches. No-Sag additionally alleged that both parties were liable for engaging in unfair competition against it.[3]

At trial there was conflicting testimony as to whether the documents and equipment that was taken were confidential material. Ark-Ell urged that it was incumbent upon No-Sag to prove that these items were "trade secrets" and requested a jury issue to that effect. According to Ark-Ell, secrecy is a prerequisite to No-Sag's having a property or proprietary interest, and such an interest is necessary to support a claim of unfair competition.

The trial court directed a verdict against Ark-Ell and O'Dell on both the contract and the unfair competition counts. In so doing, the court found it unnecessary for No-Sag to establish that the items taken were secrets. It was sufficient that O'Dell had taken the material and used it to the benefit of his company.

Ordinarily, on appeal of a directed verdict, we are called upon to review the facts supporting that verdict under the standard enunciated in *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc).[4] This case is different, however, in that the principal facts are undisputed. The sole controversy revolves around the rule of law which should be applied to those facts—should the trial court have required No-Sag to establish that the items taken were "trade secrets?" Because the issue of unfair competition is one of state law,[5] we must divine, then apply the law of the State of Mississippi.[6]

The duty of an employee not to disclose trade secrets and other confidential material is implicit in the employment relationship. The action of unfair competition arises out of a violation of this duty of trust and confidence, *Kodekey Electronics, Inc. v. Mechanex Corp.*, 486 F.2d 449, 455 (10th Cir. 1973), even in the absence of an express agreement. *Water Services, Inc. v. Tesco Chemicals, Inc.*, 410 F.2d 163, 171 (5th Cir. 1969). See R. Callman, 2 Unfair Competition, Trademarks and Monopolies, 346, 362, 368 (3d ed. 1968).

The term "trade secret" is one of the most elusive and difficult concepts in the law to define.[7] The question of whether an

---

2. Ark-Ell admitted using the following items:
   1. No-Sag drawings showing clips and dies.
   2. No-Sag drawings for a Z-hook bender.
   3. No-Sag drawings for a D-end bender.
   4. A No-Sag shrinkage chart.
   5. A No-Sag gear chart.
   6. A No-Sag packing chart.

3. No-Sag also joined two other defendants, Robert F. O'Dell, II, and William C. Stewart. During the course of the trial, both of these defendants were dismissed.

4. Under this standard, the court is to view all of the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion. The motion is proper if the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not arrive at a contrary decision. *Boeing Co. v. Shipman*, 411 F.2d at 374–77.

5. See R. Callman, 2 Unfair Competition, Trademarks and Monopolies 346 (3d ed. Supp.1976).

6. Our most recent Mississippi trade secret case is no help for it dealt only with the issue of unfair competition in a technical "trade secrets" sense. Unlike the present case, it did not discuss breach of contract or disclosure of non "trade secret" confidential material. *See Cataphote Corp. v. Hudson*, 422 F.2d 1290 (5th Cir.), on remand, 316 F.Supp. 1122 (S.D.Miss. 1970), aff'd, 444 F.2d 1313 (5th Cir. 1971).

7. In *Cataphote Corp. v. Hudson*, 444 F.2d at 1315–17, we elaborated on the definition of trade secret for the purposes of Mississippi law. *See also Forest Laboratories, Inc. v. Pills-*

item taken from an employer constitutes a "trade secret," is of the type normally resolved by a fact finder after full presentation of evidence from each side. *See, e. g., Cataphote Corp. v. Hudson*, 422 F.2d 1290 (5th Cir.), on remand, 316 F.Supp. 1122 (S.D.Miss.1970), aff'd, 444 F.2d 1313 (5th Cir. 1971).

The trial court avoided submitting this question to the jury by interpreting No-Sag's complaint to allege a general breach of loyalty on the part of O'Dell. Under this theory, it is not necessary for the employer to establish that the items taken were technically "trade secrets." It is sufficient that the employer and employee were in a confidential relationship and that the employee took items that were not generally available to the public and used them in his business. Our research has uncovered few jurisdictions which have applied this less stringent theory of recovery. *See Nucor Corp. v. Tennessee Forging Steel Service, Inc.*, 476 F.2d 386 (8th Cir. 1973) (holding that under Arkansas law, employees have a high duty not to disclose to competitors confidential information received as an employee regardless of the fact that the information disclosed might not technically be considered a trade secret); Restatement (Second) of Agency, § 395 (1957).[8] We have uncovered no authority in Mississippi to support this theory of recovery. Therefore, because the trial court's directed verdict can be sustained on the breach of contract claim, we reserve judgment on the breach of loyalty and trust claim for another day.

O'Dell's contract with No-Sag was explicit in prohibiting him from revealing *any* "information concerning its inventions,

processes or methods," as well as its "confidential affairs." We see no reason why this contractual provision should not be enforced. In the absence of overreaching, the employer and employee have the right to contract to prevent disclosure of information. *See Frederick Chusid & Co. v. Marshall Leeman & Co.*, 326 F.Supp. 1043, 1060 (S.D.N.Y.1971). There have been no allegations in the present case that No-Sag took advantage of a position of superior bargaining power over O'Dell. Furthermore, such an agreement not to disclose information, unlike the covenant not to compete, cannot be challenged as an unreasonable restraint of trade. *Cataphote v. Hudson*, 444 F.2d at 1316 n. 4; R. Callman, 2 The Law of Unfair Competition, Trademarks and Monopolies 363 (3d ed. 1968). *See, e. g., Sperry Rand Corp. v. Pentronix, Inc.*, 311 F.Supp. 910, 923 (E.D.Pa.1970).

It is undisputed that much material was taken from No-Sag and at least six items were actually used. The charts and drawings used by Ark-Ell constitute "processes or methods" of No-Sag. For the purposes of this contract claim, it makes no difference whether they were technically "trade secrets;" it is sufficient that they were confidential material. *Standard Brands, Inc. v. Zumpe*, 264 F.Supp. 254, 262 (E.D.La. 1967). The record reveals that internal distribution of the materials was limited by No-Sag to employees needing the information. The secrecy agreement each employee executed put him on notice that information imparted to him was confidential. There can be no doubt that O'Dell violated his contract by using this confidential information in his capacity as operating head of Ark-Ell.[9] *See Standard Brands v. Zumpe*

---

bury Co., 452 F.2d 621 (7th Cir. 1971) (listing six factors to be considered when determining whether information constitutes a trade secret).

8. "*§ 395. Using or Disclosing Confidential Information*
"Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his

agency or in violation of his duties as agent, in competition with or to the injury of the principal, on his own account or on behalf of another, although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge."

9. The use of information obtained in violation of the confidential relationship may be enjoined despite the fact that the defendant could have

at 262; *Frederick Chusid & Co. v. Marshall Leeman & Co.*, 326 F.Supp. at 1059–60.

O'Dell also violated the provision of his employment contract which prohibited his having any other employment "which may interfere with [O'Dell's] assigned duties, or be in competition with the interests of said corporation." For at least eight months, O'Dell was both operating head of No-Sag's Canton plant and operating head of Ark-Ell, a competitor of No-Sag. This action clearly violated the contract. *Cf. Frederick Chusid & Co. v. Marshall Leeman & Co.*, 326 F.Supp. at 1061 (holding that when employees while still on the payroll formed a competing corporation and hired away several other employees of their employer, the employees had violated their duty of loyalty to the corporation); *Standard Brands, Inc. v. U. S. Partition & Packaging Corp.*, 199 F.Supp. 161, 172 (E.D.Wis.1961) ("protection of the [principal's] interest requires a full disclosure of acts undertaken in preparation for entering into competition").

In sum, we affirm the trial court insofar as the breach of contract claim is concerned, and express no opinion on the unfair competition claim. Our decision should not alter the measure of damages to be awarded at the conclusion of an accounting or the parties that will pay these damages. Both defendants will remain liable—O'Dell for breaching the contract and Ark-Ell for inducing the breach. See R. Callman, 2 Unfair Competition, Trademarks and Monopolies 495 (3d ed. 1968).

## THE PATENT COUNT

Lear Siegler owns United States Patent 3,071,168 which covers a die designed to cut and form springs. The die was invented by Mr. Zygmunt M. Surletta in September 1957, and first employed by No-Sag in October 1957. The application for the patent was filed on March 18, 1958. It is undisputed that Ark-Ell uses this patented die in its business. It, of course, follows that No-Sag is suing Ark-Ell for patent infringement.

Ark-Ell defends on the ground that the patent is invalid under 35 U.S.C. § 102(b) 1954, which provides that:

A person shall be entitled to a patent unless . . . (b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

The parties have stipulated that springs from an early design of this die was sold by No-Sag more than a year prior to filing of the application for the patent.[10] If the statute were interpreted literally, the stipulation by itself would establish the invalidity of the patent. As we emphasized in a recent case, "a single instance of competitive exploitation of the invention by the inventor prior to the critical date can raise both the 'on sale' and 'in public use' bars to patentability." *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 277 (5th Cir. 1974).

Judicial gloss on the provision, however, has created an exception to the one year limitation period for experimental use:

The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as [a public] use.

*City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 134, 24 L.Ed. 1000 (1878). The trial court employed this exception in finding that any sales of the springs by No-Sag prior to one year before the application for the patent was filed were made during the experimentation period rendering the patent valid.

■ The test as to whether the experimental use exception applies hinges upon

secured the knowledge from other sources. *Standard Brands, Inc. v. Zumpe*, 264 F.Supp. at 262 n. 15.

**10.** The stipulation read:

It is hereby stipulated, by and between the parties, that sinuous wire springs, cut opposite-

ended, were sold more than twelve months prior to the filing date of the patent in suit, and that those springs were produced on a die which incorporated the features of the Surletta patent here in suit.

the *primary* intent of the company. As we made clear in *Yarn Processing*, "the experimental use exception applies, despite the presence of a profit motive, if experimentation is the inventor's dominant purpose . . . ." 498 F.2d at 288 n. 7. Experimentation need not be the inventor's "sole motivation." *Id.*

Ark-Ell's position that the stipulation alone mandates judgment in its favor is simply untenable. The trial court employed the correct standard when it held that the sale of springs cut during the experimental process does not in itself bar the application of the experimental exception. As the Supreme Court has said, "where, as incident to [experimental] use, the product of [the invention's] operation is disposed of by sale, such profit from its use does not change its character . . . ." *Smith & Griggs Mfg. Co. v. Sprague*, 123 U.S. 249, 256, 8 S.Ct. 122, 126, 31 L.Ed. 141 (1887).

■ In reviewing the trial court's application of this rule of law to the facts, we are governed by the clearly erroneous standard. Fed.R.Civ.P. 52(a); *Ayers v. Western Line Consolidated School District*, 555 F.2d 1309, 1315 (5th Cir. 1977); *Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426 (5th Cir. 1977). We hold that the trial court was not clearly erroneous in its conclusion that the use of the die one year prior to the patent was for experimental purposes only. We are persuaded by the fact that during this period, the design of the die was in a constant state of flux as Surletta worked to upgrade the ability of the die to produce a commercially marketable spring. We agree with the trial court that those springs actually sold were not done so pursuant to a plan to exploit the die, but instead the sale of the springs was merely a method of disposing of the springs produced during the experimental period. Therefore, No-Sag's Patent No. 3,071,168 was valid and the judgment against Ark-Ell for patent infringement stands.

The judgment of the district court is AFFIRMED.