731 S.E.2d 288

**MILLIKEN & COMPANY, Respondent,**

v.

**Brian MORIN, Petitioner.**

**No. 27154.**

Supreme Court of South Carolina.

Heard March 20, 2012.

Decided Aug. 1, 2012.

26

John S. Nichols and Blake Hewitt, Bluestein, Nichols, Thompson, & Delgado, both of Columbia, for Petitioner.

Charles E. Carpenter, Jr., Carpenter Appeals & Trial Support, LLC, of Columbia, Henry L. Parr, Jr., David H. Koysza, and Martin M. Tomlinson, Wyche Burgess Freeman, & Parham, and John C. Glancy, Ogletree, Deakins, Nash, Smoak, & Stewart, all of Greenville, for Respondent.

Justice HEARN.

Milliken & Company sued Brian Morin after he resigned from the company and started a new venture using Milliken's proprietary information. The crux of its suit was that Morin breached the confidentiality and invention assignment agreements he signed when he started working for Milliken. A jury found for Milliken, and the court of appeals affirmed. *Milliken & Co. v. Morin*, 386 S.C. 1, 11–12, 685 S.E.2d 828, 834–35 (Ct.App.2009). We granted certiorari to review the narrow issue of whether these agreements are overbroad as a matter of law. We hold they are not and affirm as modified.

## FACTUAL/PROCEDURAL BACKGROUND

Morin began working for Milliken as a research physicist in 1995 in its Spartanburg, South Carolina facility. As a condition of his employment, Morin had to sign an "Associate Agreement" which contained provisions regarding confidentiality and the assignment of certain inventions. The confidentiality agreement reads as follows:

CONFIDENTIAL INFORMATION means all competitively sensitive information of importance to and kept in confidence by Milliken, which becomes known to me through my employment with Milliken and which does not fall within the definition of Trade Secret above.[1] Such Confidential Information may be valuable to Milliken because of what it costs to obtain, because of the advantages Milliken enjoys from its exclusive use, or because its dissemination may harm Milliken's competitive position.

. . . .

B. EXCEPT as required in my duties to Milliken, I will never, either during my employment by Milliken or thereafter, use or disclose, modify or adapt any ... Confidential Information as defined in paragraph 3

---

1. In his brief, Morin also challenges the breadth of the trade secret definition. However, he did not contend it was overbroad before the court of appeals, much less even cite that provision to it. Therefore, he cannot now maintain his overbreadth challenge encompasses the definition of trade secret. *See Camp v. Springs Mortg. Corp.*, 310 S.C. 514, 516, 426 S.E.2d 304, 305 (1993) (declining to address issue not addressed by the court of appeals).

hereinabove until three (3) years after the termination of my employment except as authorized in the performance of my duties for Milliken.

Morin's duty to assign his inventions to Milliken is somewhat longer:

4. INVENTIONS means discoveries, improvements and ideas (whether or not shown or described in writing or reduced to practice), mask works (topography or semiconductor chips) and works of authorship, whether or not patentable, copyrightable or registerable, (1) which relate directly to the business of Milliken, or (2) which relate to Milliken's actual or demonstrably anticipated research or development, or (3) which result from any work performed by me for Milliken, or (4) for which any equipment, supplies, facility or Trade Secret or Confidential Information of Milliken is used, or (5) which is developed on any Milliken time.

. . . .

A. With respect to Inventions made, authored and conceived by me, either solely or jointly with others, (1) during my employment, whether or not during normal working hours or whether or not at Milliken's premises; or (2) within one year after termination of my employment,[2] I will:

 a. Keep accurate, complete and timely records of such Inventions, which records shall be Milliken property and retained on Milliken's premises.

 b. Promptly and fully disclose and describe such Inventions in writing to Milliken.

 c. Assign (and I do hereby assign) to Milliken all of my rights to such Inventions, and to applications for letters patent, copyright registrations and/or mask work registrations in all countries and to letters patent, copyright registrations and/or mask work registrations granted upon such Inventions in all countries.

 d. Acknowledge and deliver promptly to Milliken (without charge to Milliken but at the expense of Milliken)

---

2. Invention assignment agreements which extend beyond the term of employment are called "trailer" and "holdover" clauses.

such written instruments and to do such other acts as may be necessary in the opinion of Milliken to preserve property rights against forfeiture, abandonment or loss and to obtain, defend and maintain letters patent, copyright registrations and/or mask work registrations and to vest the entire right and title thereto in Milliken.

NOTICE: This is to notify you that paragraph A of this Milliken "Associate Agreement" you are being asked to sign as a condition of your employment does not apply to an Invention for which no equipment, supplies, facility or proprietary information of Milliken was used and which was developed entirely on your own time, and (1) which does not relate (a) directly to the business of Milliken or (b) to Milliken's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by you for Milliken.

Over the next nine years with Milliken, Morin was promoted twice, first to Senior Research Physicist and then to Team Leader for the Advanced Yarns Team. During the time Morin was in charge of the Advanced Yarns Team, one of Milliken's goals was to investigate the use of additives and equipment modifications to create a new type of fiber. To seek out potential uses for such a product, Milliken sent Morin to a trade show in Anaheim, California, in the Fall of 2003. Shortly thereafter, he began drafting a business plan for his own company, Innegrity, which would manufacture this new fiber. He then resigned from Milliken on May 19, 2004, and filed a patent for the fiber, which he labeled Innegra, the following November.

Milliken first caught wind of Morin's plans after he invited his former colleagues to attend a presentation he was giving at a gathering of venture capitalists in Greenville, South Carolina. After noting the similarities between Innegrity's business plan and certain projects being conducted at Milliken, Milliken raised concerns that Morin had violated the Associate Agreement. This suit soon followed.

Milliken brought several claims against Morin, but only its claims for breach of the confidentiality agreement, breach of invention assignment provisions, breach of the duty of loyalty,

and violation of the South Carolina Trade Secrets Act were submitted to the jury. The jury found for Milliken on its breach of the confidentiality and invention assignment agreement claims, but it found for Morin on the remaining causes of action. In the end, the jury awarded Milliken $25,324 in damages.[3] Morin appealed, arguing that these agreements are overbroad and therefore unenforceable, but the court of appeals disagreed and affirmed. *Milliken*, 386 S.C. at 11–12, 685 S.E.2d at 834–35. We granted certiorari.

## STANDARD OF REVIEW

An action for breach of contract is an action at law. *Sterling Dev. Co. v. Collins*, 309 S.C. 237, 240, 421 S.E.2d 402, 404 (1992). On appeal from an action at law tried by a jury, we sit merely to correct errors of law. *Erickson v. Jones St. Publishers, L.L.C*, 368 S.C. 444, 464, 629 S.E.2d 653, 663–64 (2006). "Whether a contract is against public policy or is otherwise illegal or unenforceable is generally a question of law for the court." 17B C.J.S. *Contracts* § 1030. We review questions of law de novo. *Town of Summerville v. City of N. Charleston*, 378 S.C. 107, 110, 662 S.E.2d 40, 41 (2008).

## LAW/ANALYSIS

### I. APPLICABLE STANDARD

We must first resolve a question left unanswered by the court of appeals, which is under what rubric we are to evaluate the enforceability of these agreements. Morin argues that we should analyze them as non-compete agreements and thus strictly construe them in favor of the employee. We disagree.

"According to the early common law of England, an agreement in restraint of a man's right to exercise his trade or calling was void as against public policy." *Standard Register Co. v. Kerrigan*, 238 S.C. 54, 59, 119 S.E.2d 533, 536 (1961).

---

3. Pursuant to the invention assignment clause, Milliken requested that the circuit court assign the Innegra patent to it from Innegrity. Because Innegrity was no longer a party to the proceedings when the case was tried, the court denied Milliken's request. The court of appeals affirmed, *Milliken*, 386 S.C. at 8–9, 685 S.E.2d at 832–33, and Milliken did not seek certiorari on this issue.

The rationale behind this categorical rule was that at the time a man had to be apprenticed in his trade and was bound by law to exercise it. *Id.* at 59–60, 119 S.E.2d at 536. "Hence, to enforce such an agreement was to deny such person the right to earn his living and to require him to violate an express provision of the law." *Id.* at 60, 119 S.E.2d at 536. As the law and realities of employment have progressed, however, there has been " 'some amelioration of the ancient disfavor.' " *Id.* (quoting *Welcome Wagon, Inc. v. Morris*, 224 F.2d 693, 698 (4th Cir.1955)).

> "Modern courts have usually, in passing on these contracts, employed three criteria: (1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate business interest? (2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood? (3) Is the restraint reasonable from the standpoint of a sound public policy?"

*Id.* (quoting *Welcome Wagon*, 224 F.2d at 698). We reaffirmed and expounded upon these principles in *Rental Uniform Service of Florence, Inc. v. Dudley*, 278 S.C. 674, 301 S.E.2d 142 (1983). In doing so, we reiterated that "[r]estrictive covenants not to compete are generally disfavored and will be strictly construed against the employer" and added that they must also be reasonably limited "with respect to time and place." *Id.* at 675, 301 S.E.2d at 143. This is the framework Morin would have us apply here.

The agreements under review, however, are not in restraint of trade. *See* Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies* § 14:6 (4th ed.2009) ("An employee's express commitment not to disclose his employer's confidential information, whether or not it comprises trade secrets, 'unlike the covenant not to compete cannot be challenged as an unreasonable restraint of trade.' " (quoting *Lear Siegler, Inc. v. Ark–Ell Springs, Inc.*, 569 F.2d 286, 289 (5th Cir.1978))); *id.* § 14:17 ("If the employee agrees that all inventions and improvements in the employer's field, patentable and unpatentable, which are developed by the employee during his employment shall be the employer's property, such a contract is not invalid or unenforceable as an

unreasonable restraint. The contract may even expressly impose such a duty for a period of time after termination of the employment. . . .").

Holdover clauses do not fit this mold because they do "not limit the employee's post-employment activities except with respect to the affected inventions and improvements." *NovelAire Techs., L.L.C. v. Harrison,* 50 So.3d 913, 919 (La. Ct.App.2010) (quotations omitted). Furthermore, they "are simply a recognition of the fact of business life that employees sometimes carry with them to new employers inventions or ideas so related to work done for a former employer that in equity and good conscience the fruits of that work should belong to the former employer." *Dorr–Oliver, Inc. v. United States,* 193 Ct.Cl. 187, 432 F.2d 447, 452 (Cl.Ct.1970). Thus, they do not operate in restraint of the employee's trade but merely vest ownership of an invention with the entity which ought to have it. Similarly, "noncompete agreements are viewed as restraints of trade which limit an employee's freedom of movement among employment opportunities, while nondisclosure agreements seek to restrict disclosure of information, not employment opportunities." *Revere Transducers, Inc. v. Deere & Co.,* 595 N.W.2d 751, 761 (Iowa 1999); *see also Hayes–Albion v. Kuberski,* 421 Mich. 170, 364 N.W.2d 609, 614 (1984) (holding Michigan's non-compete statute "has no application where the plaintiff is not seeking to prevent the former employee from engaging in a similar business, but to prevent him from using the secret knowledge of his former employer").

Because these agreements are not in restraint of trade, we hold there is no "ancient disfavor" and thus they are not to be strictly construed in favor of the employee. *See Carolina Chemical Equip. Co. v. Muckenfuss,* 322 S.C. 289, 302, 471 S.E.2d 721, 728 (Ct.App.1996) (Cureton, J., dissenting) (" 'In this area, courts impose no presumptions against employers and do not subject the employee's promise or covenant not to disclose to a rigid test or analysis.' " (quoting Timothy D. Scranton & Cherie Lynne Wilson, *Postemployment Covenants Not to Compete in South Carolina: Wizards and Dragons in the Kingdom,* 42 S.C. L.Rev. 657, 682 (1991))). Accordingly, the scope of the restriction is determined using ordinary

principles of contract law.[4] *See Revere Transducers,* 595 N.W.2d at 761 ("Nondisclosure-confidentiality agreements enjoy more favorable treatment in the law than do noncompete agreements."); *NovelAire,* 50 So.3d at 918 ("NovelAire contends that the Agreement is a standard contract to provide for the ownership, as between an employer and an employee, of discoveries the employee made while working for the employer, and to keep those discoveries as confidential. NovelAire contends that neither of these contractual requirements constitute non-compete contracts. We agree.").

██ Nevertheless, these agreements are still restrictive covenants and public policy demands their scope be subject to judicial review for reasonableness. When evaluating these provisions, courts should look to the more general standard enunciated in *Standard Register,* namely whether the restriction is reasonable in that it is no greater than necessary to protect the employer's legitimate interests, and it is not unduly harsh in that it curtails the employee's ability to earn a living.[5] 238 S.C. at 60, 119 S.E.2d at 536; *see also Revere*

---

4. If upon review they are so broad as to effectively become non-compete agreements, then they are subject to the higher burden. *See Almers v. S.C. Nat'l Bank of Charleston,* 265 S.C. 48, 59, 217 S.E.2d 135, 140 (1975) (holding a pension forfeiture clause invoked when an employee went to work for a competitor had the same effect as a non-compete agreement because "[w]hen pruned to their quintessence, they tend to accomplish the same results and should be treated accordingly"); *Carolina Chemical Equip. Co.,* 322 S.C. at 293–94, 471 S.E.2d at 723 (majority opinion) ("Despite its designation as a 'Covenant Not to Divulge Trade Secrets,' this section would substantially restrict Muckenfuss's competitive employment activities. Because it basically has the effect of a covenant not to compete, we must subject it to the same scrutiny as a covenant not to compete."). The clauses in question here are not this broad and therefore do not implicate these cases. *See* discussion, *infra,* Part II.

5. Geographic scope has no relevance for invention assignment or confidentiality provisions. *Revere Transducers,* 595 N.W.2d at 761; Peter Caldwell, *Employment Agreements for the Inventing Worker: A Proposal for Reforming Trailer Clause Enforceability Guidelines,* 13 J. Intell. Prop. L. 279, 296 (2006). However, a holdover clause must be reasonably limited in time. Altman & Pollack, *supra,* § 14:17. On the other hand, the absence of a time limitation in a confidentiality clause will not automatically render it invalid. *Revere Transducers,* 595 N.W.2d at 761; *see also Carolina Chemical Equip. Co.,* 322 S.C. at 301, 471 S.E.2d at 727 (Cureton, J., dissenting) ("Agreements not to divulge

*Transducers,* 595 N.W.2d at 761–62 (noting that reasonableness elements of non-compete clause analysis still remain for confidentiality agreements and "[t]he determining factor of whether assignment-of-rights-agreements are enforceable seems to be one of reasonableness"); *Ingersoll–Rand Co. v. Ciavatta,* 216 N.J.Super. 667, 524 A.2d 866, 869 (N.J.Super.A.D.1987) (holding an invention assignment clause must "be reviewed as to its reasonableness, with an awareness of the practical realities of the business and employment world"); Caldwell, *supra,* at 292, 299 (stating the "subject matter is the only truly relevant factor" for holdover clauses, and it must be balanced by " 'weigh[ing] the competing interest of employer and employee and [ ] giv[ing] full consideration to the public interest.' " (quoting *Universal Winding Co. v. Clarke,* 108 F.Supp. 329, 332 (D.Conn.1952))).

## II. ENFORCEABILITY OF AGREEMENTS

With this framework in mind, we turn next to the enforceability of the holdover and confidentiality agreements Morin signed. In our opinion, both of them are facially valid.

### A. Holdover Clause

 As has been eloquently stated, "A naked assignment or agreement to assign, in gross, a man's future labors as an author or inventor[—]in other words, a mortgage on a man's brain, to bind all its future products[—]does not address itself favorably to our consideration." *Aspinwall Mfg. Co. v. Gill,* 32 F. 697, 700 (C.C.D.N.J.1887). However, where the agreement does not "implicate all of a researcher's future inventions 'in gross' " but rather applies to inventions derived from his work for the employer, it is enforceable. *St. John's Univ., N.Y. v. Bolton,* 757 F.Supp.2d 144, 162 (E.D.N.Y.2010). Morin himself even agrees that Milliken has no right to his "inventive ideas unless those ideas relate directly to his work for Milliken."

---

confidential information, unlike noncompetition agreements, may be valid and enforceable under certain circumstances even though they are unlimited as to time and place."). In any event, employers are afforded greater leeway with the temporal scope of these clauses than with noncompete agreements. *Revere Transducers,* 595 N.W.2d at 761; Caldwell, *supra,* at 297.

An employer therefore has a legitimate interest in protecting inventions that are the fruits of its employees' efforts while working for the company. Indeed, such provisions "are simply a recognition of the fact of business life that employees sometimes carry with them to new employers inventions or ideas so related to work done for a former employer that in equity and good conscience the fruits of that work should belong to the former employer." *Dorr–Oliver*, 432 F.2d at 452. Thus, we must first examine the scope of the invention assignment clause and determine whether it falls within these parameters.

The invention assignment agreement Morin signed is embodied in a complex set of paragraphs which by no means are an exercise in clarity. After sorting through the morass, however, the impact of the agreement is much narrower than it may appear initially. The agreement first applies to all inventions, a term which is defined quite broadly. It covers:

discoveries, improvements and ideas (whether or not shown or described in writing or reduced to practice), mask works (topography or semiconductor chips) and works of authorship, whether or not patentable, copyrightable or registerable,

(1) which relate directly to the business of Milliken, or

(2) which relate to Milliken's actual or demonstrably anticipated research or development, or

(3) which result from any work performed by me for Milliken, or

(4) for which any equipment, supplies, facility or Trade Secret or Confidential Information of Milliken is used, or

(5) which is developed on any Milliken time.

Accordingly, any discovery, etc., which meets *any* of the five criteria contained in the agreement is an invention and is to be assigned.

However, the agreement also contains a rather broad exception to this inclusive definition. It excepts an invention, as defined above,

for which no equipment, supplies, facility or proprietary information of Milliken was used *and*

which was developed entirely on your own time, *and*

(1) which does not relate

 (a) directly to the business of Milliken or

 (b) to Milliken's actual or demonstrably anticipated research or development, *or*

(2) which does not result from any work performed by you for Milliken.

(emphasis added).

 Morin's contention is that the invention assignment clause is overbroad because it grants Milliken rights to one of Morin's inventions "irrespective of whether his invention is legitimately an extension of research he did for Milliken." [6] This argument is based on a misreading of the agreement. Under general principles of contract law, we find first as a matter of law that this agreement is unambiguous. *See Miles v. Miles*, 393 S.C. 111, 117, 711 S.E.2d 880, 883 (2011) ("[W]hether a contract is ambiguous is a question of law."). We must therefore apply the contract's plain language. *Alexander's Land Co. v. M & M & K Corp.*, 390 S.C. 582, 598, 703 S.E.2d 207, 215 (2010). Under the terms of the agreement, if the invention *either* [7] does not relate to Milliken's work or was not the result of work performed by the employee for Milliken, then it is not covered. Conversely, for the exception to *not* apply—and thus require assignment of the invention—it must *both* relate to Milliken's business/research and result from the employee's work at Milliken. Thus, so long as the invention does not relate to work performed by the employee, it is not to be assigned.

 Accordingly, the agreement is not broader than necessary to protect Milliken's legitimate business interests. Moreover, the one-year holdover provision is eminently reasonable. *See*

---

6. Morin directs his arguments towards the interplay between subparts (1) and (2) of the exception, not the rest of it. Because we do not believe requiring the assignment of inventions that were developed using the employer's equipment, supplies, and proprietary information, or which were developed on the employer's time, renders the agreement overbroad as a matter of law, we similarly confine our discussion.

7. We reject Morin's argument that Milliken really meant to use the word "and" instead of "or" in the exception.

*Rental Uniform Serv.,* 278 S.C. at 676, 301 S.E.2d at 143 (finding a three-year restraint is not "obnoxious" even in the context of a non-compete agreement). It also is not unduly harsh or oppressive because Morin still is entitled to any invention that does not result from his work at Milliken; thus, he is still of great value to future employees. We therefore hold that Milliken's invention assignment and holdover clause is not so broad as to be unenforceable as a matter of law.

## B. Confidentiality Clause

It is widely recognized that an employer may "restrain a former employee from disclosing and using confidential information which was developed as a result of the employer's initiative and investment and which the employee learned as a result of the employment relationship." *GTI Corp. v. Calhoon,* 25 Ohio Misc. 187, 309 F.Supp. 762, 768 (S.D.Ohio 1969); *see also Roberson v. C.P. Allen Const. Co.,* 50 So.3d 471, 475 (Ala.Civ.App.2010) ("[A]n employer has a protectable interest sufficient to justify enforcement of a noncompete agreement if an employee was in a position to gain confidential information, access to secret lists, or to develop a close relationship with clients. A protectable interest can also arise from the employer's investment in its employee, in terms of time, resources and responsibility." (quotations and alterations omitted)); *ACAS Acquisitions (Precitech) Inc. v. Hobert,* 155 N.H.381, 923 A.2d 1076, 1084–85 (2007) ("Legitimate interests of an employer that may be protected from competition include: the employer's trade secrets that have been communicated to the employee during the course of employment; confidential information other than trade secrets communicated by the employer to the employee, such as information regarding a unique business method; an employee's special influence over the employer's customers, obtained during the course of employment; contacts developed during the employment; and the employer's development of goodwill and a positive image."); *Shepherd v. Pittsburgh Glass Works, LLC,* 25 A.3d 1233, 1244 (Pa.Super.2011) ("The kinds of business interests that are considered legitimate and protectable under a restrictive covenant include trade secrets and confidential information . . . ."). As above, we must therefore first

delineate the boundaries of Milliken's confidentiality agreement and determine whether it falls within this scope.

The heart of Morin's claim is that the confidentiality provision is so broad that it prevents him from using his own general skills, knowledge, and inventive ability as opposed to just restricting the dissemination of Milliken's propriety information.[8] The definition of confidential information in Milliken's Associate Agreement contains five elements, all of which must be met in order for the information in question to be deemed confidential:

(1) competitively sensitive information

(2) of importance to and

(3) kept in confidence by Milliken,

(4) which becomes known to the employee through his employment with Milliken, and

(5) which is not a trade secret.

It does not take much elaboration to see that rather than covering general skills and knowledge, it encompasses only important information not generally known to the public which becomes known to the employee through his employment with Milliken. Thus, the court of appeals did not err in holding that "[t]he three-year provision did not prohibit Morin from disclosing or using any and all information he learned working at Milliken, or using the general knowledge and skills he learned while working there." *Milliken*, 386 S.C. at 11–12, 685 S.E.2d at 834.

Milliken accordingly has a legitimate business interest it can protect through the use of the confidentiality agreement, and the agreement does not sweep any broader than this on its face. Although not necessarily required, the agreement is also reasonably limited to only three years. *See Rental Uniform Serv.*, 278 S.C. at 676, 301 S.E.2d at 143. Furthermore, it is not unduly harsh and oppressive as Morin is perfectly able to use his general skills and knowledge in a new line of employment. While Morin may be restricted from using certain information he learned at Milliken for his own

---

8. Although Morin's brief lodges a multi-faceted attack against the confidentiality clause, the sole issue on which we granted certiorari is whether it is facially enforceable as a matter of law.

personal advantage, these agreements are designed to strike an appropriate balance between protecting an employer's valuable interest in its proprietary information and permitting an employee to find gainful employment in his chosen field. *See GTI Corp.*, 309 F.Supp. at 768; *Serv. Ctrs. of Chicago, Inc. v. Minogue*, 180 Ill.App.3d 447, 129 Ill.Dec. 367, 535 N.E.2d 1132, 1135 (1989). In our opinion, Milliken's agreement, on its face, strikes a valid balance and therefore is enforceable.

## CONCLUSION

We therefore hold confidentiality and invention assignment clauses are not in restraint of trade and should not be strictly construed in favor of the employee. Under a more general reasonableness standard of enforceability, Milliken's agreements here are reasonably tailored and therefore enforceable as a matter of law. We accordingly affirm the court of appeals, modifying its opinion only to the extent that we adopt the standard enunciated above.

TOAL, C.J., PLEICONES, BEATTY and KITTREDGE, JJ., concur.