**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Ralph Dawkins and Michelle Dawkins, Marcel Franquelin and Patricia Franquelin, Michael A. Martin and Adriana S. Iaquinto-Martin, Louis Glavinos and Kimberly Glavinos, Daniel J. O'Grady and Kaitlyn E. Grigoleit, Christopher M. Raybon and LaShonda K. Jones Raybon, Morris K. White and Rebecca A. White, Paul A. Banker and April D. Banker, Patrick K. Daly and Brenda Daly, Respondents,

v.

Eastwood Homes of Columbia, LLC d/b/a Eastwood Homes; Eastwood Construction Partners, LLC f/k/a Eastwood Construction LLC d/b/a Eastwood Homes; and Eastwood Construction, LLC, Appellants.

Appellate Case No. 2024-000369

———————

Appeal From Charleston County
Mikell R. Scarborough, Master-In-Equity

———————

Unpublished Opinion No. 2025-UP-239
Heard May 14, 2025 – Filed July 16, 2025

———————

**AFFIRMED IN PART, VACATED IN PART**

———————

James Edward Bradley, of Moore Bradley Myers, PA, of West Columbia, for Appellants.

Jamie A. Khan and Ross A. Appel, both of McCullough Khan, LLC, of Mt. Pleasant; and Michael Thomas Cooper, of Alex N. Apostolou, LLC, of Charleston, all for Respondents.

---

**PER CURIAM:**   This case involves a contract dispute between a residential homebuilder (Eastwood) and several homebuyers (Respondents).   The sole issue before this court is whether certain provisions in Eastwood's standard contract are unconscionable or against public policy.   The circuit court referred this same question to a master-in-equity, who found the main provision at issue (paragraph 26) was ambiguous, heard the parties' competing interpretations of that provision, adopted Eastwood's interpretation, and ultimately declared paragraph 26 and part of another provision (paragraph 25) unconscionable.   Because neither party challenged the master's adoption of Eastwood's interpretation, it is the law of the case. Conducting our review through that same lens, we affirm.

## BACKGROUND

This case stems from contracts between Eastwood and nine homebuyers.   Each buyer separately signed Eastwood's standard agreement for the construction of a semi-custom home in a neighborhood on John's Island.   The essence of the case is that Eastwood terminated Respondents' contracts before their sales closed.

Eastwood claims it had the sole authority to terminate the contracts pursuant to two provisions.   Paragraph 26, titled "Seller Option to Cancel Prior to Closing," states in relevant part:

> If for any reason, a bona fide dispute should arise between the Buyer and [Eastwood], in [Eastwood]'s sole judgment, <u>prior to Closing</u>, and if such bona fide dispute cannot be resolved to their mutual satisfaction then [Eastwood] at its sole option may terminate this [contract] by written notice to the Buyer prior to Closing.

Paragraph 26 also provides that if Eastwood terminates the contract, Eastwood must return all deposits to the buyer and pay "an additional amount of $100.00, as liquidated damages in the event [Eastwood's] cancellation constitutes a default under th[e] agreement."   The paragraph precludes the buyer from pursuing any other

remedies. The beginning of paragraph 25 is similar—it provides Eastwood with an array of remedies if a buyer defaults on the contract, including damages; however, if Eastwood defaults, the last sentence of the first clause in paragraph 25 only allows the buyer to recover any deposits made, shields Eastwood from any "liab[ility] for consequential damages or for damages or delays," and constitutes a release and waiver of any claims against Eastwood.

Eastwood sent each buyer a "mutual release." The releases explained the contracts were canceled, provided for a refund of deposit money and an additional $100 in "damages" to each buyer, and included an offer for first refusal once the homes were eventually constructed but at the future, current market value. Respondents did not sign the mutual releases or deposit their refunds; they filed suit shortly thereafter.

The reasoning behind Eastwood's decision to terminate the contracts is not germane to the question of unconscionability before us. This is because after Respondents filed suit, the circuit court referred the declaratory claim involving paragraphs 25 and 26 to a master-in-equity for the limited purpose of deciding whether those provisions were enforceable. As mentioned before, the master found paragraph 26 was ambiguous and adopted Eastwood's interpretation of it. Eastwood believed it possessed unilateral authority to cancel the contracts at any time before closing and for any reason. Under that interpretation, the master concluded that paragraph 26 and the last sentence of the first paragraph of paragraph 25 were unconscionable and violated public policy. Eastwood filed a motion to reconsider, which was denied. This appeal followed.

**STANDARD OF REVIEW**

There is a small dispute about the standard of review. We find the issues before us are questions of law, which we review de novo. *See* S.C. Code Ann. § 36-2-302(1) (2003) (labeling issues of unconscionability as matters of law); *Milliken & Co. v. Morin*, 399 S.C. 23, 30, 731 S.E.2d 288, 291 (2012) ("Whether a contract is against public policy or is otherwise illegal or unenforceable is generally a question of law for the court." (quoting 17B C.J.S. *Contracts* § 1030)); *Milliken*, 399 S.C. at 30, 731 S.E.2d at 291 (explaining appellate courts review questions of law de novo).

**UNCONSCIONABILITY**

As mentioned in the introduction to this opinion, neither party challenged the master's finding that paragraph 26 was ambiguous or the master's adoption of Eastwood's interpretation of that provision. Therefore, we too must conduct our

unconscionability analysis under that interpretation. *See Lindsay v. Lindsay*, 328 S.C. 329, 338, 491 S.E.2d 583, 588 (Ct. App. 1997) (explaining, "right or wrong," an unchallenged ruling is the law of the case and will not be disturbed on appeal).

Unconscionability is a fact-specific inquiry that must be decided on a case-by-case basis. *Damico v. Lennar Carolinas, LLC*, 437 S.C. 596, 611, 879 S.E.2d 746, 755 (2022). The pertinent facts and circumstances are limited to those "existing when the contract was executed." *Holler v. Holler*, 364 S.C. 256, 269, 612 S.E.2d 469, 476 (Ct. App. 2005) (quoting *Hardee v. Hardee*, 348 S.C. 84, 95–96, 558 S.E.2d 264, 269–70 (Ct. App. 2001)); § 36-2-302(1). The analysis itself is divided into two prongs: the first looks to "procedural" unconscionability, which can be described as the absence of meaningful choice and "typically speaks to the fundamental fairness of the bargaining process." *Damico*, 437 S.C. at 611–13, 879 S.E.2d at 754–55 (quoting *Smith v. D.R. Horton, Inc.*, 417 S.C. 42, 49, 790 S.E.2d 1, 4 (2016)). The second prong, "substantive" unconscionability, finds its footing in terms that are so "one-sided" and "oppressive that no reasonable person would make them and no fair and honest person would accept them." *Id.* at 611, 879 S.E.2d at 754 (quoting *Fanning v. Fritz's Pontiac-Cadillac-Buick, Inc.*, 322 S.C. 399, 403, 472 S.E.2d 242, 245 (1996)).

Eastwood's arguments against procedural unconscionability hinge greatly on the fact that Respondents are highly educated and sophisticated consumers who signed the contracts with knowledge of the provisions at issue. Still, the master found Eastwood's form contract was an adhesion contract, and Eastwood does not appear to challenge that finding on appeal. "Adhesion contracts are not per se unconscionable"; however, because "one party to an adhesion contract has virtually no voice in the formulation of the terms and language used in the contract, courts tend to view adhesive . . . agreements with considerable skepticism, as it remains doubtful any true agreement ever existed . . . ." *Id.* at 613, 879 S.E.2d at 756 (citation modified).

We agree with the master's finding of procedural unconscionability in this case, particularly based on our supreme court's recent opinion in *Damico*. Like the contracts there, the standard contracts Eastwood provided were given to all of the homebuyers, "with only a few blank spaces to fill in, including the buyer's name, the relevant property address, and the purchase price," and "[o]ther than those type of minor blank spaces, the terms of the purchase and sale agreement—particularly those of any consequence to [the seller/developer]—were non-negotiable." *Id.* at 614, 879 S.E.2d at 756. In finding procedural unconscionability in *Damico*, the supreme court concluded the sophistication of the individual homebuyers "pale[d]

in comparison" to the homebuilder/general contractor, "[g]iven that [the builder] ha[d] sold thousands of homes . . . , whereas [the buyers] w[ould] likely only purchase, at best, a handful of homes in their entire lifetime," and characterized the builder as "significantly more sophisticated" than the buyers "in home buying transactions." *Id.* at 614–15, 879 S.E.2d at 756–57.

Respondents admit they are intelligent and successful in their respective careers, but we read *Damico* as suggesting their intelligence and success does not put them on an equal playing field with a large homebuilder like Eastwood, specifically in the context of a home purchase and especially when presented with a "take-it-or-leave it," nonnegotiable, form contract. *See id.* at 614–15, 879 S.E.2d at 756–57; *see also Kennedy v. Columbia Lumber & Mfg. Co.*, 299 S.C. 335, 343, 384 S.E.2d 730, 735–36 (1989) ("We have . . . taken judicial cognizance of the fact that a modern buyer of new residential housing is normally in an unequal bargaining position as against the seller."); *315 Corley CW LLC v. Palmetto Bluff Dev., LLC*, 444 S.C. 521, 532, 908 S.E.2d 892, 898 (Ct. App. 2024) (finding "the Defendants' reliance on the sophistication of the Plaintiffs as wealthy purchasers of secondary homes is misplaced in light of our supreme court's analysis in *Damico*"), *cert. granted* (June 25, 2025). Further, there are suggestions in the record of an "element of surprise" in how these paragraphs were to be applied in actuality, *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 25, 644 S.E.2d 663, 669 (2007), and though no "high-pressure tactics" seem to have been utilized, the contracts were "hastily presented" for signature and Respondents say they felt pressure to agree. *Id.* at 27, 644 S.E.2d at 670.

Turning to substantive unconscionability, it is true that "adhesive contracts are not unconscionable in and of themselves," but their terms must be "even-handed." *Damico*, 437 S.C. at 614, 879 S.E.2d at 756 (emphases omitted). It is also true that procedural and substantive unconscionability need not be equally present for a contract or contract term to be deemed unconscionable. *See id.* at 612, 879 S.E.2d at 755 (citing 17A Am. Jur. 2d *Contracts* § 272). This brings us to the question of whether the provisions at issue here are "so one-sided and unreasonable as to render [them] unconscionable." *Id.* at 615, 879 S.E.2d at 757. The heart of this prong, at least for this case, is mutuality. "Mutuality . . . is a paramount consideration when assessing the substantive unconscionability of a contract term." 17A Am. Jur. 2d *Contracts* § 272. "A contract may be considered substantively unconscionable when a clause or term in the contract is totally one-sided or overly harsh, such that it oppresses or unfairly surprises an innocent party, [and] there is an overall imbalance in the obligations and rights imposed by the bargain . . . ." *Id.* (footnotes omitted). "A term may also be said to be substantively suspect if, viewed at the time the

contract was formed, it reallocates the risks of the bargain in an objectively unreasonable or unexpected way." *Id.* (footnotes omitted).

On this element, Eastwood again relies on the argument that Respondents are "sophisticated, experienced, educated people" and contends that the provisions cannot be deemed unconscionable because they "merely return [Respondents] to the position they held before entering the contract." We are not persuaded. Part of the issue we see with paragraph 26 is that, based on the record and at the time the contract was entered, Respondents had a different understanding of how and when that provision would be applied. Respondents say they believed there would be some "process" to work toward "mutual satisfaction" if and when a dispute arose and prior to the extreme measure of canceling the contracts. Respondents also say that Eastwood's affiliates affirmed this understanding. However, according to the interpretation of the provision that Eastwood offered at trial, which the master adopted and the parties do not dispute on appeal, paragraph 26 is actually a termination-at-will provision allowing Eastwood to cancel the contract for any reason and in its absolute discretion. This is plainly "one-sided," and, at least on this record, was "unexpected," a "surprise[]," and provided an imbalance in power by giving the homebuilder—who was already in a superior position—the unilateral power to cancel the contract. 17A Am. Jur. 2d *Contracts* § 272; *see also Kennedy*, 299 S.C. at 343, 384 S.E.2d at 735–36 ("We have . . . taken judicial cognizance of the fact that a modern buyer of new residential housing is normally in an unequal bargaining position as against the seller.").

As to paragraph 25, our concerns are more centered on the lack of mutuality of remedy because, if Respondents defaulted, Eastwood was in a position to bring any and all claims and seek any and all damages against them, whereas if Eastwood defaulted, Respondents could not pursue any claims against it and could only receive a refund. It is true that "parties are always free to contract away their rights," *Simpson*, 373 S.C. at 28, 644 S.E.2d at 670, and that mutuality of remedy is not required in contracts, *see Lackey v. Green Tree Fin. Corp.*, 330 S.C. 388, 401–02, 498 S.E.2d 898, 905 (Ct. App. 1998); however, with paragraph 26 allowing for a unilateral, no-discussion cancellation and paragraph 25 not allowing any recourse for Respondents other than a refund plus the $100 under paragraph 26, Eastwood is effectively shielded from any liability with a full coat of armor, and we do not see how a reasonable person would have agreed to terms with such lopsided effect in a home purchase scenario. *See, e.g.*, *Damico*, 437 S.C. at 615–16, 879 S.E.2d at 757 (finding the homebuilder's contractual "creation of a procedural defense to liability [was] wholly unreasonable and oppressive to Petitioners"); *D.R. Horton*, 417 S.C. at 50, 790 S.E.2d at 5 ("[W]e find that D.R. Horton's attempts to disclaim implied

warranty claims and prohibit *any* monetary damages are clearly one-sided and oppressive. Under the terms of [the provision], the only remedy provided for a defect in the home is repair or replacement—options left entirely in the discretion of D.R. Horton. This is no remedy at all because it leaves the relief to the whim of D.R. Horton while simultaneously allowing no monetary recuperation . . . .").

Eastwood relies heavily on a 2013 case from our supreme court, *Gladden v. Boykin*, 402 S.C. 140, 739 S.E.2d 882 (2013), in arguing the master's unconscionability findings were error. That case involved a self-employed home inspector, whose contract with recent homebuyers included a clause limiting the inspector's liability to the return of the home inspection fee, which the court determined was not unconscionable. *Id.* at 144–46, 739 S.E.2d at 884–85. As described throughout this opinion, we find the analysis in *Damico* more applicable to this case. In terms of bargaining power and the fundamental fairness of any negotiation process, there is a significant distinction between a large homebuilder operating across several states and a self-employed home inspector. As explained earlier in this opinion, we read *Damico* and similar cases as clarifying the principle that the sophistication of a residential homebuyer cannot compare to that of a large homebuilder in the context of a home purchase and especially when involving a nonnegotiable, form contract. *See Damico*, 437 S.C. at 614–15, 879 S.E.2d at 756–57; *see also Kennedy*, 299 S.C. at 343, 384 S.E.2d at 735–36 ("We have . . . taken judicial cognizance of the fact that a modern buyer of new residential housing is normally in an unequal bargaining position as against the seller."); *315 Corley*, 444 S.C. at 532, 908 S.E.2d at 898 (finding "the Defendants' reliance on the sophistication of the Plaintiffs as wealthy purchasers of secondary homes is misplaced in light of our supreme court's analysis in *Damico*").

We have fully considered Eastwood's point that, up until closing, Eastwood bore a large portion of the cost and risk in building these homes. Even so, the provisions at issue—under the master's unchallenged interpretation—allow Eastwood to evade *any* liability, cancel its contracts for any or no reason at all, and provide buyers with no recourse if Eastwood were to default other than a refund and an additional $100. This result—that the defaulting consumer is fully exposed to liability but the defaulting builder is completely insulated—is complete asymmetry, and is at odds with the rule that a party may terminate a contract so long as the termination follows the contract and is "not contrary to equity and good conscience." *Richland Wholesale Liquors v. Glenmore Distilleries Co.*, 818 F.2d 312, 315 (4th Cir. 1987). Accordingly, we affirm the finding that paragraph 26 and the final sentence of the first paragraph of paragraph 25 are unconscionable.

## PUBLIC POLICY

"A refusal to enforce a contract on the ground[] of public policy is distinguished from a finding of unconscionability[.]" *Damico*, 437 S.C. at 622, 879 S.E.2d at 760 (quoting 17A Am. Jur. 2d *Contracts* § 238 (Supp. 2021)). When reviewing a contract from a public policy perspective, "rather than focusing on the relationship between the parties and the effect of the agreement upon them," the court must "consider the impact of such arrangements upon society as a whole." *Id.* (quoting 17A Am. Jur. 2d *Contracts* § 238 (Supp. 2021)).

We are less inclined to agree that the provisions at issue here violate public policy. At the outset, we question whether the master truly reviewed paragraph 25 under a public policy analysis. There is clear language in the master's order indicating a finding that paragraph 26 violates public policy, but the only mentions of paragraph 25 that relate to public policy are in conclusory sentences and a heading, with the subsequent analysis and findings relating more to unconscionability. Regardless, it seems that most of the master's reasons for finding the provisions in violation of public policy largely mirror his unconscionability analysis and findings, which we affirm as described above.

The master relied on "South Carolina's strong policy of protecting home buyers" in finding violations of public policy. *See Damico*, 437 S.C. at 621, 879 S.E.2d at 760 ("South Carolina has a deeply-rooted and long-standing policy of protecting new home buyers."). This traditionally relates to the warranties that spring from the sale of a home and certify the home is free from defects. *See Kennedy*, 299 S.C. at 341–42, 384 S.E.2d at 734–35 (rejecting a result as against public policy in which "a builder who constructs defective housing escapes liability while a group of innocent new home purchasers are denied relief because of the imposition of traditional and technical legal distinctions"); *id.* at 344, 384 S.E.2d at 736 ("We have made it clear that it would be intolerable [as a matter of public policy] to allow builders to place defective and inferior construction into the stream of commerce."). Because it is not clear that a provision allowing a homebuilder to cancel a sale before closing implicates these concerns, we vacate the master's finding that the provisions at issue violate public policy.

**AFFIRMED IN PART, VACATED IN PART.**

**THOMAS, HEWITT, and CURTIS, JJ., concur.**